Docket No. 83281–Agenda 2–May 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY MITCHELL, Appellant.

Opinion filed January 27, 2000.

JUSTICE RATHJE delivered the opinion of the court:

A jury convicted defendant, Anthony Mitchell, of two counts of first degree murder. The same jury also determined that defendant was eligible for the death penalty and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the circuit court of St. Clair County sentenced defendant to death. 

 On direct review, we affirmed defendant’s conviction and sentence. 
People v. Mitchell
, 152 Ill. 2d 274 (1992) (
Mitchell I
). The United States Supreme Court denied defendant’s petition for a writ of 
certiorari
. 
Mitchell v. Illinois
, 508 U.S. 962, 124 L. Ed. 2d 685, 113 S. Ct. 2936 (1993). On December 7, 1993, defendant filed a petition for post-conviction for relief, and on May 16, 1996, defendant filed an amended petition. The State moved to dismiss the amended petition without an evidentiary hearing. Defendant then filed three additional claims for post-conviction relief, based on this court’s decisions in 
People v. Brandon
, 162 Ill. 2d 450 (1994), and 
People v. Nitz
, 173 Ill. 2d 151 (1996). The court allowed the State’s motion to dismiss to stand against the additional counts. The court granted the State’s motion to dismiss, and this appeal followed. Because the judgment challenged in defendant’s petition imposed a sentence of death, the appeal was taken directly to this court. 134 Ill. 2d R. 651(a).

BACKGROUND

Defendant’s convictions arose from the stabbing deaths of teenagers David and Dawn Lieneke in July 1989. The facts detailing the crime and the investigation leading to defendant’s arrest are set out in our original opinion, and we provide only a brief summary here. Additional facts will be noted where necessary to address the particular arguments defendant raises.

David and Dawn lived with their grandparents. On the evening of July 4, 1989, their grandparents were out playing bingo. The grandparents returned home at approximately 10:30 p.m. and found David’s and Dawn’s dead bodies. Eighteen-year-old David was lying in a pool of blood in the hallway. He had been stabbed seven times. The wounds were large and deep, and David had died from blood loss caused by a stab wound to the liver and from the collapse of both lungs, due to a stab wound to his chest. Thirteen-year-old Dawn was lying in a pool of blood on her grandmother’s bed. She also had seven stab wounds in her body, including one that went through the right temple and penetrated her brain. Dawn bled to death from knife wounds to the aorta and liver.

The police located defendant by tracing the license plate number of his sister’s car. Defendant had been driving that car on the night of the murders. Witnesses had spotted the car at the scene. Defendant confessed to the crime, explaining that he had gone to the Lieneke’s house looking for Viroon Williams, whom defendant claimed had tried to run him down with a car the day before and who had stolen a VCR, radio, and video game from defendant’s mother’s house. Williams sometimes stayed with the Lienekes. Defendant went into the house and stabbed David, and then killed Dawn when she screamed his name and ran into the bedroom. David was still alive and was threatening to tell Williams, so defendant stabbed him again.

In addition to defendant’s confession, the State relied upon the testimony of Maurice Douglas, who was with defendant on the night of the murders. Defendant showed the bloody knife to Douglas and told him that he had just killed two persons. The police recovered the murder weapon–a survival knife–from defendant’s basement. The knife had blood on it, and the blood was consistent with a mixture of David’s and Dawn’s blood. The police also recovered black clothes and a pair of two-toed shoes. Blood on a pair of pants recovered from defendant’s basement was consistent with Dawn’s blood. One of the two-toed shoes matched a shoe print that was left in the mud near where defendant’s sister’s car was seen parked in the victims’ neighborhood. 

Defendant testified and denied any involvement in the crime. Defendant’s testimony suggested that Williams was the murderer. Defendant denied owning the clothes or the knife, but said that Williams had an outfit like the one recovered and that he had seen Williams with the knife. Defendant denied showing the knife to Douglas or saying that he killed two persons. Defendant testified that the police made him sign the confession by raising their voices.

Defendant was convicted of the murders and sentenced to death. After his convictions and sentence were affirmed by this court and his petition for a writ of 
certiorari
 to the United States Supreme Court was denied, defendant filed a post-conviction petition. As twice amended, defendant’s post-conviction petition contained 28 counts. Eleven counts, however, restated constitutional arguments that were rejected on direct appeal. In dismissing the petition without an evidentiary hearing, the trial court ruled that the majority of defendant’s claims were barred by waiver and 
res judicata
. As to defendant’s claims of ineffective assistance of counsel, the court ruled that defendant had not made a substantial showing that his constitutional rights had been violated.

The trial court found merit to one of defendant’s claims based on 
Brandon
 and 
Nitz
. Defendant argued that at the time of his trial and sentencing he was taking two medications to control his epilepsy–Depakote and Phenobarbital–and that these medications were psychotropic. Defendant contended he was denied due process when he did not receive a fitness hearing and that he received the ineffective assistance of counsel when his trial and appellate attorneys failed to invoke his right to such a hearing. The trial court agreed that Depakote was psychotropic medication and that defendant therefore would have been entitled to a fitness hearing. See Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a); 
Brandon
, 162 Ill. 2d 450. However, the trial court ruled that defendant could not prevail on this claim because he was seeking to benefit from the retroactive application of a “new rule” announced in 
Brandon
.
(footnote: 1) The court based its analysis on 
Teague v. Lane
, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989); and 
People v. Flowers
, 138 Ill. 2d 218 (1990), which held that, except in certain limited situations, new constitutional rules of criminal procedure are not applied retroactively to cases pending on collateral review. Accordingly, the trial court dismissed defendant’s petition without an evidentiary hearing. Defendant raises six issues on appeal.

ANALYSIS

Standard of review

A petition filed pursuant to the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122–1 
et seq
. (West 1998)) is a collateral attack on a prior conviction and sentence. 
People v. Mahaffey
, 165 Ill. 2d 445, 452 (1995). To obtain relief under the Act, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgement being challenged. 725 ILCS 5/122–1(a) (West 1998); 
People v. Tenner
, 175 Ill. 2d 372, 378 (1997).

An evidentiary hearing on the petition is required only when the allegations of the petition, supported by the trial record and the accompanying affidavits, make a substantial showing of a violation of a constitutional right. 
People v. Hobley
, 182 Ill. 2d 404, 428 (1998). For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in the supporting affidavits are to be taken as true. 
People v. Caballero
, 126 Ill. 2d 248, 259 (1989). If the circuit court determines that the petition should be dismissed without an evidentiary hearing, its judgment is subject to 
de novo
 review. 
People v. Coleman
, 183 Ill. 2d 366, 388-89 (1998). 

Psychotropic Medication

Defendant argues that he was denied due process when he did not receive a hearing to determine his fitness for trial while under medication. The statute in effect at the time of his trial provided, in part, as follows: 

“A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication.” Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a). 

Defendant further argues that he received the ineffective assistance of counsel when his trial attorney failed to invoke his right to a fitness hearing and when his counsel on direct appeal failed to raise the due process and ineffective assistance of counsel arguments as they related to his failure to receive a section 104–21(a) fitness hearing.

The factual basis for defendant’s claim, as provided in his post-conviction petition and the accompanying affidavits, is as follows. Defendant has suffered from epilepsy since the age of six, when he suffered a head injury. To control his seizures, defendant has been taking medications for many years. During his trial and sentencing, defendant’s epilepsy medications were Depakote and Phenobarbital. The trial court was aware that defendant was taking medication for epilepsy.

The Physicians’ Desk Reference categorizes Depakote as an “antimanic agent,” which is a subcategory of “psychotherapeutic agents.”
(footnote: 2) Physicians’ Desk Reference 215 (53d ed. 1999) (PDR). Defendant attached to his petition the affidavit of Dr. James O’Donnell, a pharmacology consultant. O’Donnell states in the affidavit that Depakote and Phenobarbital are both central nervous system depressants that are prescribed to prevent epileptic seizures. O’Donnell lists the probable side effects of the drugs as “sedation, hallucinations, dizziness, incoordination, depression, emotional changes and behavioral deterioration, psychosis and aggression.” O’Donnell further states that “[t]he combination of the effects of both of these drugs can cloud the sensorium (alter the ability to think clearly) and thus effect [
sic
] any individual’s ability to make certain decisions.” O’Donnell concludes that “[t]he overall sedative effect may have caused Mr. Mitchell to appear too relaxed or too detached during court proceedings.”

Before deciding the merits of defendant’s arguments, we address the State’s contention that Phenobarbital and Depakote are not psychotropic medications. In 
People v. Britz
, 174 Ill. 2d 163, 198 (1996), we adopted the definition of “psychotropic medications” found in the Mental Health and Developmental Disabilities Code: 

“ ‘Psychotropic medication’ means medication whose use for antipsychotic, antidepressant, antimanic, antianxiety, behavioral modification or behavioral management purposes is listed in AMA Drug Evaluations, latest edition, or Physicians’s Desk Reference, latest edition, or which are administered for any of these purposes.” 405 ILCS 5/1–121.1 (West 1998).

We further relied on the definition given by the United States Supreme Court in 
Washington v. Harper
, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990): 

“[P]sychotropic drugs are ‘medications commonly used in treating mental disorders such as schizophrenia,’ the effect of which is ‘to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind.’ “ 
Britz
, 174 Ill. 2d at 198, quoting 
Washington
, 494 U.S. at 214, 108 L. Ed. 2d at 193, 110 S. Ct. at 1032.

The trial court found that Depakote was a psychotropic drug, but that Phenobarbital was merely “an anticonvulsant barbiturate.” We agree that Depakote falls within the purview of section 104–21(a)’s reference to “psychotropic drugs or other medications.” Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a). Depakote is listed in the PDR as a psychotherapeutic antimanic agent and thus clearly falls within the 
Britz
 definition. Further, Dr. O’Donnell stated in his affidavit that the combination of Depakote and Phenobarbital could affect the individual’s ability to think clearly and to make certain decisions. We thus agree with defendant that his ingestion of Depakote would have entitled him to a fitness hearing under section 104–21(a). This conclusion renders unnecessary a discussion of whether Phenobarbital fits the 
Britz
 definition. 

Our decision is not in conflict with 
People v. Kidd
, 175 Ill. 2d 1 (1996), another case in which a defendant argued that his epilepsy medication was a psychotropic drug. In 
Kidd
, the defendant was taking Dilantin to control his seizures. We applied the 
Britz
 definition and held that Dilantin was not psychotropic medication because its use for psychotropic purposes was not listed in the PDR or the AMA Drug Evaluations. Further, it was not being administered to the defendant for psychotropic purposes. 
Kidd
, 175 Ill. 2d at 17-19. By contrast, Depakote is listed in the PDR as a psychotherapeutic antimanic medication, and thus falls squarely within the 
Britz
 definition.

We turn now to the merits of defendant’s arguments. Defendant argues that the trial court erred in finding that 
Brandon
 could not be applied retroactively to cases pending on collateral review, and points out that 
Nitz
 and 
People v. Neal
, 179 Ill. 2d 541 (1997), were both cases in which this court applied 
Brandon
 in post-conviction cases. The State counters that it did not raise the 
Flowers
/
Teague
 retroactivity rule in those cases and therefore this court has not yet ruled on this issue. According to the State, the 
Flowers
/
Teague
 rule bars application of 
Brandon
 to petitioner’s case. We need not address this issue, however, as we believe that the dismissal of defendant’s psychotropic medication claims was proper for other reasons.

Due Process

We first address defendant’s argument that he was denied due process when he did not receive the fitness hearing to which he was entitled. Petitioner’s claim–that denial of a section 104–21(a) fitness hearing is a denial of due process–has its genesis in 
Nitz
. In 
Nitz
, the defendant raised a 
Brandon
 issue for the first time in a post-conviction petition. The State argued that 
Brandon
 was not applicable because the defendant did not argue that he received the ineffective assistance of counsel. Thus, the defendant’s claim was lacking a constitutional foundation. We rejected the State’s argument and held that the court’s failure to follow the relevant statutory procedures resulted in a due process violation to the defendant. 
Nitz
, 173 Ill. 2d at 160-61.

The reasoning in 
Nitz
 was as follows. The due process clause of the fourteenth amendment prohibits the prosecution of a defendant who is unfit for trial. U.S. Const., amend. XIV; 
Medina v. California
, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992). Where information raises the possibility that an accused is incompetent, the failure to inquire concerning competency violates the accused’s due process rights. 
Pate v. Robinson
, 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966) (holding that the Illinois court’s failure to invoke the relevant statutory procedures deprived the defendant of an inquiry concerning his fitness to stand trial, and defendant therefore suffered a due process violation). The relevant statute–section 104–21(a)–provides for a fitness hearing, and therefore the court’s failure to invoke it denied defendant an inquiry into his fitness for trial and consequently denied him due process. 
Nitz
, 173 Ill. 2d at 155-61.

Nitz
 correctly recognized that due process does not mandate a particular procedure for an inquiry into fitness; it requires only that there be an adequate procedure to implement the right to an inquiry. 
Nitz
, 173 Ill. 2d at 160, citing 
Drope v. Missouri
, 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975). 
Nitz
 further correctly recognized that the particular procedures to be invoked are purely by legislative design and that the right to a particular procedure is wholly statutory. 
Nitz
, 173 Ill. 2d at 160.

Although we recognized in 
Nitz
 that defendant’s right to section 104–21(a)’s procedure was wholly statutory, we reached the somewhat contradictory conclusion that the trial court’s failure to invoke the statute denied defendant due process. The relevant passage in 
Nitz
 is our conclusion that, “Here, as in 
Pate
, because no procedure was invoked, defendant was denied inquiry into the issue of his fitness. Due process was thereby denied.” 
Nitz
, 173 Ill. 2d at 161. This conclusion does not follow from the recognition that the particular procedure to be invoked is purely by legislative design and that defendant’s right to that procedure is wholly statutory. Three members of the court dissented in 
Nitz
, on the basis that a defendant’s right to a section 104–21(a) fitness hearing was statutory and that the court was creating a constitutional deprivation where none existed. See 
Nitz
, 173 Ill. 2d at 165-66 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). The dissent concluded that defendant’s petition (which did not argue ineffective assistance of counsel) should have been dismissed because it lacked a constitutional foundation. After careful consideration and reevaluation, we have determined that the dissent’s position in 
Nitz
 was correct and that this court erred in holding that a denial of a section 104–21(a) fitness hearing was in and of itself a due process violation.

In 
Nitz
, we failed to distinguish the United States Supreme Court’s decision in 
Pate
. In that case, the Supreme Court held that the defendant should have received a fitness hearing because the evidence introduced on his behalf established a 
bona fide
 doubt of his fitness. 
Pate
, 383 U.S. at 385, 15 L. Ed. 2d at 822, 86 S. Ct. at 842. The court’s failure to inquire into the defendant’s fitness in the face of evidence establishing a 
bona fide
 doubt of his fitness deprived the defendant of his constitutional right to a fair trial. 
Pate
, 383 U.S. at 385, 15 L. Ed. 2d at 822, 86 S. Ct. at 842. The Supreme Court later explained its 
Pate
 holding in 
Drope
:

“In 
Pate v. Robinson
, 383 U.S. 375[, 15 L. Ed. 2d 815, 86 S. Ct. 836] (1966), we held that the failure to observe procedures adequate to protect a defendant’s right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. Although in 
Robinson
 we noted that Illinois ‘jealously guard[ed] this right,’ 
id
., at 385, we held that the failure of the state courts to invoke the statutory procedures deprived Robinson of the inquiry into the issue of his competence to stand trial to which, 
on the facts of the case, we concluded he was constitutionally entitled
. 
The Court did not hold that the procedure prescribed by Ill. Rev. Stat., ch. 38, §104–2 (1963), was constitutionally mandated, although central to its discussion was the conclusion that the statutory procedure, if followed, was constitutionally adequate.
 [Citations.] Nor did the Court prescribe a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure. Rather, it noted that under the Illinois statute a hearing was required where the evidence raised a ‘ “bona fide doubt” ’ as to a defendant’s competence, and the Court concluded ‘that the evidence introduced on Robinson’s behalf entitled him to a hearing on this issue.’ “ (Emphasis added.)
 Drope
, 420 U.S. at 172–73, 43 L. Ed. 2d at 113-14, 95 S. Ct. at 904.

Thus, 
Drope
 clearly recognized that Illinois’ statutory procedure–requiring a fitness hearing when there is a 
bona fide
 doubt of defendant’s fitness–was constitutionally adequate to safeguard a defendant’s due process right not to be tried or convicted while unfit to stand trial. The Supreme Court did not hold, as 
Nitz
 implies, that the failure to follow 
any
 statute concerning a defendant’s fitness for trial deprives a defendant of due process. See 
Nitz
, 173 Ill. 2d at 160-61. Under the 
Nitz
 rationale, if the legislature passed a statute entitling defendants who watch professional wrestling to a hearing on their mental fitness, the court’s failure to follow the statute would be a denial of due process. This cannot be so. As 
Nitz
 correctly recognized, “due process does not mandate any particular procedure for the inquiry; it requires merely that there be an adequate procedure to implement the right to an inquiry.” 
Nitz
, 173 Ill. 2d at 160.

The United States Supreme Court has determined the constitutional adequacy of the Illinois statutory scheme of requiring a fitness hearing when there is a 
bona fide
 doubt of defendant’s fitness. Thus, Illinois has in place procedures that are constitutionally adequate to protect a defendant’s due process right not to be tried while unfit.
(footnote: 3) Due process does not require that everyone taking “psychotropic or other medication” under medical direction should be granted a fitness hearing. Section 104–21(a)’s provision is merely a statutory right granted by the legislature–a right that the legislature has now taken away. See 725 ILCS 5/104–21(a) (West 1998). Statutes do not confer constitutional rights, and the allegation of a deprivation of a statutory right is not a proper claim under the Act. 
People v. Orndoff
, 39 Ill. 2d 96, 99 (1968). The Illinois statutory scheme for determining fitness comports with due process with or without section 104–21(a) fitness hearings. 
Nitz
’s conclusion that a defendant may raise in a post-conviction petition a denial of a section 104–21(a) fitness hearing as a denial of due process was erroneous, and we hereby overrule 
Nitz
. 

Nitz
’s conclusion was largely based on this court’s continued equating of a defendant’s ingestion of psychotropic medication with a 
bona fide
 doubt of defendant’s fitness. This position has its genesis in 
Brandon
, although it was not specifically articulated until 
People v. Gevas
, 166 Ill. 2d 461 (1995). In 
Brandon
, we stated that section 104–21(a) “evinces a recognition by the General Assembly that psychotropic medication is an important signal that a defendant may not be competent to stand trial.” 
Brandon
, 162 Ill. 2d at 457. In 
Gevas
, we specifically stated that, “The legislature has equated the administering of psychotropic medication to a defendant with a 
bona fide
 doubt as to fitness to stand trial.” 
Gevas
, 166 Ill. 2d at 469. Three members of this court have taken the position that the right to a fitness hearing in section 104–21(a) cannot be equated with a 
bona fide 
doubt of a defendant’s fitness and is much broader than the constitutional right with which it is mistaken. 
People v. Birdsall
, 172 Ill. 2d 464, 482 (1996) (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). These justices have pointed out that, under section 104–21(a), a defendant taking psychotropic or other medication is entitled to a fitness hearing “even in the absence of evidence that might otherwise trigger an inquiry into the separate constitutional right.” 
Birdsall
, 172 Ill. 2d at 482 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). As previously stated, section 104–21(a) merely contained a statutory right conferred by the legislature. The legislature has now rewritten the statute to remove that right. If the right was constitutional, the legislature could not have eliminated it.

This court’s prior determination that the legislature equated the ingestion of psychotropic medication with a 
bona fide
 doubt of defendant’s fitness was simply erroneous. Section 104–11(a) of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/104–11(a) (West 1998)) provides, in part, that “[w]hen a bona fide doubt of the defendant’s fitness is raised, the court shall order a determination of the issue before proceeding further.” Section 104–21(a), at the relevant time, provided that “[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issues of his fitness while under medication.” Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a). The wording of these provisions is significant. The first places a mandatory burden on the trial judge to order a determination of a defendant’s fitness when a 
bona fide
 doubt of that fitness is raised. See 
People v. Reed
, 177 Ill. 2d 389, 393 (1997) (“use of the word ‘shall’ is generally considered to express a mandatory reading”); Black’s Law Dictionary 1375 (6th ed. 1990) (“[a]s used in statutes, contracts, or the like, [shall] is generally imperative or mandatory”). The second provision merely provides that a defendant taking psychotropic or other medication under medical direction is entitled to a fitness hearing. The word “ ‘entitled’ “ means “ ‘to give a right or legal title to’ “ (
Brandon
, 162 Ill. 2d at 461, quoting Black’s Law Dictionary 532 (6th ed. 1990)), or “[t]o qualify for; to furnish with proper grounds for seeking or claiming” (Black’s Law Dictionary 532 (6th ed. 1990)). See also 
People v. Tilson
, 108 Ill. App. 3d 973, 977 (1982) (“the word ‘entitled’ signifies the granting of a right or privilege to be exercised at the option of parties for whose benefit it is used; it is directly opposed to the idea of imposing an obligation or limitation”). Section 104–21(a) does not, as does section 104–11, require the trial judge to make a further inquiry when certain facts are brought to his attention. Rather, it gives the defendant the “proper grounds for seeking or claiming” a fitness hearing. As Justice Miller has stated, “While section 104–21(a) declares that a defendant receiving psychotropic drugs is entitled to a fitness hearing, the statute does not establish a defendant’s incompetency, say that a hearing must be held if the defendant refuses one, or excuse counsel’s failure to request a hearing in a timely manner.” 
Gevas
, 166 Ill. 2d at 473 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.); see also 
People v. Kinkead
, 168 Ill. 2d 394, 419 (1995) (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.) (“[t]o say that a defendant is ‘entitled’ to a fitness hearing is much different from saying that a hearing is absolutely required in all circumstances, no matter how tardy the defendant’s request might be”). We erred in 
Gevas
 when we stated, and in 
Brandon
 when it implied, that the legislature equated the administering of psychotropic medication to a defendant with a 
bona fide
 doubt as to his fitness to stand trial, and we no longer adhere to that conclusion.

Ineffective Assistance of Counsel

Defendant also argues that he received the ineffective assistance of counsel when his trial and appellate attorneys failed to invoke his right to a section 104–21(a) fitness hearing. We first address whether defendant received the ineffective assistance of appellate counsel when his attorney failed to argue on direct appeal that he was denied due process when the trial court failed to hold a section 104–21(a) fitness hearing. 
To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel’s performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance so prejudiced the defendant as to deny him a fair trial. 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052
, 2064 (1984).
 As applied to claims involving the failure of appellate counsel to raise a particular issue, the defendant must show that the failure to raise the issue was objectively unreasonable and that, but for this failure, a reasonable probability exists that the sentence or conviction would have been reversed. 
People v. Mack
, 167 Ill. 2d 525, 532 (1995). Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues that in his judgment are without merit. 
People v. Whitehead
, 169 Ill. 2d 355, 381 (1996).

Defendant cannot meet the first prong of the 
Strickland
 test in arguing that appellate counsel should have argued that he was denied due process when the court failed to hold 
sua sponte
 a fitness hearing when it found out that defendant was taking psychotropic medication. As thoroughly set out earlier in this opinion, defendant’s right to a fitness hearing under section 104–21(a) is a statutory rather than a constitutional right. At the time of defendant’s direct appeal, no Illinois court had held that a trial court’s failure to order 
sua sponte
 a section 104–21(a) fitness hearing deprived a defendant of due process. Defendant’s attorney therefore would have had no reason to believe that this court was about to reach that conclusion. Further, existing case law would have indicated that the argument was meritless. See 
Balfour v. Haws
, 892 F.2d 556 (7th Cir. 1989); 
People v. Lopez
, 216 Ill. App. 3d 83 (1991); 
People v. Balfour
, 148 Ill. App. 3d 215 (1986); 
People v. Tilson
, 108 Ill. App. 3d 973 (1982). Clearly defendant’s attorney’s decision not to raise this issue on direct appeal was not objectively unreasonable. 

We next address whether trial counsel was ineffective for not requesting a fitness hearing and whether appellate counsel was ineffective for failing to argue trial counsel’s ineffectiveness in not requesting a fitness hearing. We must first consider the relevant standard for assessing claims of ineffective assistance of counsel for failing to request section 104–21(a) fitness hearings. In
 Brandon
, we cited the 
Strickland
 standard, but then held that a defendant could meet the prejudice prong of 
Strickland
 merely by showing that, if his attorney would have requested a fitness hearing, he would have gotten one. 
Brandon
, 162 Ill. 2d at 458-59. This was an unwarranted modification of the 
Strickland
 rule. 

To establish prejudice under 
Strickland
 a defendant must show a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. As the 
Brandon
 dissent correctly noted, “the relevant inquiry in this case is not whether a fitness hearing would have been conducted if defense counsel had requested one under section 104–21(a), but whether the outcome of the hearing would have been favorable to the defendant, that is, whether the defendant would have been found unfit to stand trial. The majority, by considering only whether a fitness hearing would have been held (
Brandon
, 162 Ill. 2d at 457-59), simply presumes the existence of prejudice in certain circumstances in which such a presumption is not warranted.” 
Brandon
, 162 Ill. 2d at 462-63 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.) 

Clearly, defining the test as whether a defendant would have received a fitness hearing cannot be correct. If a defendant would have been found fit to stand trial, he suffered no prejudice by not having a fitness hearing. The correct test for evaluating prejudice in these situations is whether a reasonable probability exists that, if defendant would have received the section 104–21(a) fitness hearing to which he was entitled, the result of the proceeding would have been that he was found unfit to stand trial. 
Brandon
 is overruled.

We now consider whether defendant’s trial attorney was ineffective for failing to request a hearing. We will not find this claim waived for defendant’s failure to raise it on direct appeal because it depends on facts outside the original trial record. See 
Whitehead
, 169 Ill. 2d at 372. After carefully reviewing the record and the evidence attached to the post-conviction petition, we cannot say that there was a reasonable probability that defendant would have been found unfit to stand trial.

Under section 104–10 of the Code, a defendant is unfit for trial “if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense.” Here, the record belies any claim that defendant did not understand the nature of the proceedings or was unable to assist in his defense. Defendant’s exchanges with the trial judge do not display any confusion about the nature of the proceedings, and defendant assisted in his defense by testifying in his own behalf. Defendant testified to his whereabouts at the relevant times, denied any involvement in the crime, and asserted that his confession to the police was coerced. Defendant’s testimony covered over 50 pages of the report of proceedings and does not disclose any signs of confusion about the nature or purpose of the proceedings. Similarly, defendant gave extensive testimony in support of his motions to suppress statements and evidence, and there is no indication that defendant did not understand the nature or purpose of those proceedings. 

In 
Kinkead
, we downplayed the importance of a defendant’s trial court demeanor in determining fitness, stating that it encouraged “unprincipled speculation into matters requiring medical expertise.” 
Kinkead
, 168 Ill. 2d at 411. This position fails to consider the fundamental purpose of a fitness hearing, which is solely to determine a person’s ability to function within the context of a trial. 
People v. Murphy
, 72 Ill. 2d 421, 432 (1978). By statute, evidence on the following matters is admissible at a fitness hearing:

“(1) The defendant’s knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

(2) The defendant’s ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel;

(3) The defendant’s social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes.” 725 ILCS 5/104–16(b) (West 1998).

Defendant’s trial demeanor, as evidenced by the record, is clearly relevant to these factors. Nothing in the record indicates that defendant would be found unfit based on a consideration of these factors. 

We recognize that a trial judge cannot rely on trial demeanor to dispense with a fitness hearing in the face of evidence of a 
bona fide
 doubt of defendant’s fitness (
Pate
, 383 U.S. at 385-86, 15 L. Ed. 2d at 822, 86 S. Ct. at 842), but that is not the issue here; there is no evidence in the record suggesting a 
bona fide
 doubt of defendant’s fitness. The issue here is whether a reviewing court should ignore relevant and compelling evidence of a defendant’s fitness for trial when determining whether the outcome of a statutory fitness hearing would have been favorable to defendant. The evidence that defendant attached to his post-conviction petition does not show a reasonable probability that defendant would have been found unfit. First, it must be remembered that defendant was not taking these medications for any underlying psychiatric problems. He was merely taking them to control seizures. Thus, the only real question is whether these medications in and of themselves rendered defendant unfit for trial. O’Donnell’s affidavit established that the combination of defendant’s medications might have affected defendant’s ability to make certain decisions. O’Donnell also believed that the medication may have caused defendant to appear too relaxed or detached during court proceedings. O’Donnell’s affidavit simply does not establish that defendant would not have been able to understand the nature and purpose of the proceedings or to assist in his defense. 

Defendant also attached to his petition the affidavit of clinical psychologist Michael M. Gelbort. In the affidavit, Gelbort testifies to defendant’s learning disability, difficulty in school, borderline mental retardation, seizure disorder, and difficulty in processing information. In light of the factors that a trial court considers in determining fitness for trial, there is no reasonable probability that defendant would have been found unfit based on Gelbort’s testimony.

The facts of this case are similar to 
Murphy
. The issue in 
Murphy
 was whether there was a 
bona fide
 doubt of the defendant’s fitness such that the trial court should have ordered a fitness hearing. In that case, psychiatric evidence established that defendant was mentally retarded and could only “ ‘understand simple procedures but not complicated ones or those having abstract meanings.’ “ 
Murphy
, 72 Ill. 2d at 426-27. The defendant had a limited vocabulary and could not read above the first-grade level. However, the defendant testified in his own behalf, said that he knew what an attorney was and understood that his attorney was representing him, and read aloud from his signed statement and said that he could read the whole thing. 
Murphy
, 72 Ill. 2d at 429. The defendant had previously told the police that he understood his 
Miranda
 rights. In holding that the record supported the trial court’s conclusion that no 
bona fide 
doubt of defendant’s fitness existed, we stated that the evidence showed “an educable mentally handicapped young man who comprehended his situation and recognized the nature and purpose of the proceedings against him and the function of an attorney to represent him. Defendant cooperated with [his attorney] in presenting his defense.”
 Murphy
, 72 Ill. 2d at 434-35. 

The record and post-conviction affidavits show that defendant was functioning at a higher level than the defendant in 
Murphy
, fully understood the nature of the proceeding against him, and was able to cooperate in his defense. There is no reasonable probability that defendant would have been found unfit, and therefore defendant’s trial counsel was not ineffective for failing to request a fitness hearing. This conclusion also disposes of defendant’s argument that appellate counsel was ineffective for failing to raise this issue on direct appeal. 

In sum, the right to a fitness hearing that used to be provided for in section 104–21(a) was a statutory right. A defendant did not have a due process right to such a hearing, and trial courts had no obligation to
 order 
sua sponte
 a section 104–21(a) fitness hearing if a defendant did not request one. Thus, in a post-conviction case, the claim will be considered only if it is framed in the context of ineffective assistance of counsel. To prevail on such a claim, a defendant must show a reasonable probability that, if a section 104–21(a) fitness hearing would have been held, he would have been found unfit to stand trial. 

We are not unmindful of the import of today’s decision. Normally, because of 
stare decisis
 considerations, we would continue to adhere to our established precedent, even if certain members of this court disagreed with it. In this case, however, we deem it appropriate to depart from 
stare decisis
. We stated in 
Chicago Bar Ass’n v. Illinois State Board of Elections
, 161 Ill. 2d 502, 510 (1994), that “
s
tare decisis
 is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.” No reasonable observer of this court’s jurisprudence could argue that the law in this area has been developing in a principled and intelligible fashion. As Justice Harrison stated in 1998, “This court decided 
People v. Brandon
, 162 Ill. 2d 450 (1994), fewer than four years ago and has been running from it ever since.” 
Kinkead
, 182 Ill. 2d at 348 (Harrison, J., specially concurring). 

In 1995, we held that after a period of two years had passed it would be impossible to conduct a meaningful hearing as to defendant’s fitness at the time of trial and sentencing. 
Gevas
, 166 Ill. 2d at 471. In 1996, we “rejected any notion that a 
nunc pro tunc
 determination of fitness can provide the necessary reliability.” 
Nitz
, 173 Ill. 2d at 164. In 1997, we saw no problem with a retrospective fitness hearing conducted 15 years after defendant’s trial and sentencing. 
Neal
, 179 Ill. 2d at 553-56. In 1998, we held that the automatic reversal rule of 
Brandon
 had been replaced by the “case-by-case” approach and that a defendant could no longer prevail on a request for a new trial simply by showing that he had been taking psychotropic medications at the relevant time. 
Kinkead
, 182 Ill. 2d at 340. Although not clearly stated in 
Kinkead
, it appears that retrospective fitness hearings are now the norm. What was constitutionally forbidden three years ago is now compelled. This is not a principled and intelligible development of the law. As Justice Heiple wrote when rejecting 
stare decisis
 in another situation, “explicitly overruling 
Brinkmann
 is not an ‘erratic’ change in the law. In the eighteen years since 
Brinkmann
, every case interpreting 
Brinkmann
, including today’s majority opinion, has eroded its holding. I would merely make explicit what this court has done implicitly for the last eighteen years.” 
McMahan v. Industrial Comm’n
, 183 Ill. 2d 499, 518 (1998) (Heiple, J., specially concurring).

Our most important duty as justices of the Illinois Supreme Court, to which all other considerations are subordinate, is to reach the correct decision under the law. Our jurisprudence in this area has become erratic and confused, and it all stems from an erroneous statutory interpretation five years ago. 
Stare decisis
 should not preclude us from admitting our mistake, interpreting the statute correctly, and bringing some stability and reason to this area of the law. As Justice Frankfurter once observed, “Wisdom too often never comes, and so one ought not to reject it merely because it comes late.” 
Henslee v. Union Planters National Bank & Trust Co.
, 335 U.S. 595, 600, 93 L. Ed. 259, 264, 69 S. Ct. 290, 293 (1949) (Frankfurter, J., dissenting). The trial court correctly dismissed defendant’s additional claims for post-conviction relief.

Ineffective Assistance of Counsel at the Suppression Hearing

Failure to Establish “Fruit of the Poisonous Tree”

Defendant next argues that his attorney was ineffective at the hearing on his motions to suppress evidence because he failed to establish that the physical evidence recovered from defendant’s basement was the fruit of his unlawful arrest. On direct appeal, we held that defendant’s due process rights were violated by the trial court’s failure to recall critical testimony by defendant that defendant did not believe he was free to leave police custody. However, we declined to remand the matter for a new suppression hearing because we concluded that, even if the trial court would find that defendant’s confession should have been suppressed, the other evidence of defendant’s guilt was so overwhelming that introduction of his confession was harmless error. 
Mitchell I
, 152 Ill. 2d at 326. We further held that defendant had not established that the physical evidence recovered from defendant’s basement was the “fruit of the poisonous tree.” 
Mitchell I
, 152 Ill. 2d at 326-27.

Defendant argued on direct appeal that the physical evidence recovered from his basement was the fruit of his illegal detention. Defendant reasoned that he told the police that he was with Maurice Douglas on the night of the murders. The police questioned Douglas, and he told them where the murder weapon was probably hidden. We held that the record did not establish that Douglas told the police where the weapon was hidden and that defendant’s argument was based solely on conjecture. Without establishing that Douglas informed the police where defendant’s Ninja equipment and the murder weapon were hidden, defendant could not meet his initial burden of showing a connection between his detention and the police’s finding that evidence.

Defendant attached to his post-conviction petition the hearsay affidavit of Gilbert Roberts, an investigator with the office of the State Appellate Defender, who interviewed Douglas on November 19, 1993. In the affidavit, Roberts states that Douglas told him that Douglas told the police where the murder weapon was probably hidden. Defendant contends that he has now made the crucial connection showing that the physical evidence was the fruit of his unlawful detention and that his trial attorney was therefore ineffective for failing to make the connection at the suppression hearing.

Assuming, without deciding, that one can obtain an evidentiary hearing based upon inadmissable hearsay evidence, we find defendant’s argument to be meritless. Under the 
Strickland
 standard, counsel’s performance need not be evaluated if it can be shown that the defendant suffered no prejudice. 
People v. Albanese
, 104 Ill. 2d 504, 527 (1984). To meet the prejudice prong of the 
Strickland
 test, a defendant must demonstrate “that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We find defendant’s argument to be without merit because we do not believe he has shown a reasonable probability that the outcome of the suppression hearing would have been different if his attorney had made and argued the Douglas connection. 

We believe that if defendant would have argued the Douglas connection, the State would have prevailed under the inevitable discovery exception to the exclusionary rule. We recognize that, ordinarily, if the State does not raise the inevitable-discovery argument in the trial court, the argument will be considered waived. 
People v. Holveck
, 141 Ill. 2d 84, 98-99 (1990). In this case, however, there was no reason for the State to make that argument at the suppression hearing because defendant did not argue that the evidence was found only because defendant told the police about Douglas. Defendant made that argument for the first time on direct appeal, and the State then argued in its response brief that the police would inevitably have discovered Douglas even without defendant’s statement. The defendant argued in his direct appeal reply brief that the State had waived this argument. Defendant cannot argue that the State waived its right to reply to an argument that defendant had not yet made. The State also made this argument at the hearing on the motion to dismiss the post-conviction petition, and hints at it, but does not develop it, in its current appellate brief.
(footnote: 4) We believe we can properly consider this argument because we are only determining what the probable outcome of the suppression hearing would have been if defendant’s attorney would have made the argument that defendant contends he should have made. As the State raised inevitable discovery in response to the Douglas argument the first time it was made, we believe it is reasonably likely that the State would have made the argument if defendant had first made the Douglas argument at the suppression hearing.

Under the inevitable-discovery exception to the exclusionary rule, evidence that otherwise would be inadmissible may be admitted if the prosecution can show that the evidence “ ‘would inevitably have been discovered without reference to the police error or misconduct.’ ” 
People v. Edwards
, 144 Ill. 2d 108, 142 (1991), quoting 
Nix v. Williams
, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984). Professor LaFave has stated that, “Circumstances justifying application of the ‘inevitable discovery’ rule are most likely to be present if *** investigative procedures were already in progress prior to the discovery via illegal means.” 5 W. LaFave, Search & Seizure §11.4(a), at 249 (3d ed. 1996).

Here, before defendant was taken to the police station, the police were looking for a car that had been seen near where the murders occurred. The police had the car’s license plate number and knew that two black males were seen in the car. The police traced the car to defendant’s sister and learned that defendant had been driving the car the night before. The police also spoke to defendant’s mother, who knew that defendant and Douglas were together the night of the murders. Defendant and Douglas and been friends since they were five years old. Douglas’ father also knew that defendant and Douglas were together on the night of the murders. Considering the above evidence, we simply cannot accept defendant’s contention that the police would not have found out that Douglas was with him the night of the crime if they had not illegally detained him. Before the police detained defendant, they knew he had been in the car and that there was another black male in the car. Given that a thorough investigation into the violent murder of two teenagers was underway, that defendant and Douglas were friends, and that the police were speaking to people who knew that Douglas and defendant had been together that night, we believe that it was inevitable that the police would have found Douglas even if defendant had not told them that Douglas was the person who was with him. 

Defendant has not shown that the trial court erred in failing to suppress the physical evidence recovered from his basement. Assuming that the trial court would have ruled that defendant’s confession should have been suppressed, there is no reasonable probability that the court would have also ordered the physical evidence suppressed. If defendant’s attorney would have argued that the police only learned of that evidence through Douglas, and the police only learned about Douglas through defendant’s confession, there is a reasonable probability that the State would have argued the inevitable-discovery rule. We believe the State would have prevailed in showing that the physical evidence should not have been suppressed, even if the confession would have been. Accordingly, defendant has not established that his trial attorney was ineffective at the suppression hearing for failing to argue the Douglas connection. The court correctly dismissed this count of defendant’s post-conviction petition.

Failure to Establish that Defendant Would Not Have Been Able to Make a Valid Miranda Waiver

Defendant next argues that his trial counsel was ineffective at the hearing on the motion to suppress when he failed to introduce evidence that would have helped to establish that defendant was incapable of making a valid waiver of his 
Miranda
 rights. Defendant similarly raised a 
Miranda
 argument on direct appeal, but we declined to address it because we had already determined that, assuming defendant’s confession should have been suppressed, its admission into evidence was harmless error. 
Mitchell I
, 152 Ill. 2d at 330.

Defendant tries to revive the 
Miranda
 argument by relying on post-conviction affidavits that he believes help to establish that he would have been unable to make a knowing, voluntary, and intelligent waiver of his 
Miranda
 rights. Just as we held on direct appeal, however, the 
Miranda
 issue is irrelevant given our determination that any error in the admission of defendant’s confession was harmless. Defendant suggests that the jurors would have given less weight to his confession if they had been apprised of the degree of his intellectual defects. We fail to see how this contention affects our conclusion on direct appeal that all of the remaining evidence, absent defendant’s confession to the police, so overwhelmingly established his guilt that any error in the admission of his confession was harmless. Our holding on this issue in the prior appeal is 
res judicata
, and the trial court did not err in dismissing this count of defendant’s post-conviction petition.

Trial Court’s Refusal to Provide Funds for a Mitigation Expert

Defendant next argues that he was denied due process when the trial court denied his pretrial request for funds to hire a mitigation expert to assist with the capital sentencing hearing. We agree with the State that this claim is waived because it could have been raised on direct appeal. Considerations of waiver and 
res judicata
 limit the range of issues available to a post-conviction petitioner to constitutional matters that have not been, and could not have been, previously adjudicated. 
Tenner
, 175 Ill. 2d at 378. Rulings on issues that were previously raised at trial or on direct appeal are 
res judicata
, and issues that could have been raised, but were not, are waived. 
People v. Coleman
, 168 Ill. 2d 509, 522 (1995). Defendant argues that this claim is not waived because it is based on evidence outside the original trial record. We disagree. This exception to the waiver rule in post-conviction appeals refers to those claims that could not have been considered by the reviewing court on direct appeal because the claim’s evidentiary basis was 
de hors
 the record.
 Whitehead
, 169 Ill. 2d at 372. Defendant claims that, through the post-conviction affidavits of people critical of the presentence investigation report, he has now established that he was prejudiced by the trial court’s ruling. We are unsure why defendant is discussing prejudice. The question here is whether the trial court abused its discretion in denying defendant’s request for appointment of a mitigation specialist. See 
People v. Burt
, 168 Ill. 2d 49, 79 (1995). The evidence necessary to resolve that question is what was presented to the trial court at the time the request was made.

In the motion, defendant’s attorney claimed that neither he nor the staff of the public defender’s office had the necessary skills to prepare a life history of defendant. At the hearing on the motion, defense counsel elaborated that the public defender’s office did not have adequate staff to prepare a mitigation report dealing with defendant’s schooling, his family and work histories, his medical records, and his school records. However, defense counsel told the court, “for the record, I’m aware of no–certainly there is no statute or basis for this request. I’m not aware of any, and I also am not aware of any case law in the circuit that allows the same, but, I believe that this request is very important.” Defense counsel also maintained that he did not believe that the probation department could do an adequate job. 

The trial court denied the motion, and instead ordered the probation and court services department of St. Clair County to investigate defendant’s background and to prepare a report in the nature of a presentence investigation report. The court also ordered Cheryl Prost to conduct psychological examinations and tests on defendant and to make the results available to the State, defendant, and the court. The question is, in light of what defense counsel represented to the trial court, did the court abuse its discretion in denying the request for a mitigation expert? Defendant preserved this issue in his post-trial motion, and argued it at the hearing on the post-trial motion. There is no reason he could not have made this argument on direct appeal. The argument does not depend on the fact that defendant now has attached to his petition what he considers to be better mitigating evidence. That was his argument all along: that he needed funds to have someone conduct an adequate investigation and that he would not be able on his own to muster evidence of this quality. This was a routine abuse of discretion argument that should have been presented on direct appeal, as it was in 
Burt
 and 
People v. Lear
, 143 Ill. 2d 138 (1991). Defendant has waived this argument, and the trial court properly dismissed this count of the post-conviction petition.

Ineffective Assistance of Counsel: Failure to Investigate and Present Mitigating Evidence

Defendant next argues that he received the ineffective assistance of counsel when his attorney failed to conduct an adequate investigation of potential mitigating evidence and failed to present this evidence at his capital sentencing hearing. As this claim depends upon evidence outside the original trial record, it is not waived for counsel’s failure to raise it on direct appeal. See 
People v. Orange
, 168 Ill. 2d 138, 149 (1995). 

To prevail on a claim of ineffectiveness of counsel at sentencing, a defendant must show that his attorney’s performance fell below an objective standard of reasonableness and that, absent counsel’s errors, there is a reasonable probability that the trier of fact would have concluded that the balance of aggravating and mitigating factors did not warrant the death penalty. 
People v. Henderson
, 171 Ill. 2d 124, 145 (1996). Counsel has a duty to make reasonable investigations of potential sources of mitigating evidence to present at a capital sentencing hearing.
 People v. Towns
, 182 Ill. 2d 491, 510 (1998). When made after a thorough investigation of the law and facts relevant to plausible options, strategic choices of what evidence to present are virtually unchallengeable. 
Towns
, 182 Ill. 2d at 514; 
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. Choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation. 
Strickland
, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Background

We begin by reviewing the evidence presented at the sentencing hearing. The State presented no evidence in aggravation. Defendant presented three witnesses in mitigation. The first person to testify was probation officer Michael Buettner, who prepared a presentence investigation report of defendant. Buettner testified that defendant was born on December 21, 1969. Buettner also testified about defendant’s family members, giving their ages and cities of residence. Defendant lived with his mother, who provided his room and board. Buettner testified that defendant attended school until the eighth grade and then dropped out. Defendant received average to below-average grades. For part of his education, defendant was enrolled in a home bound study program, but Buettner did not know what that was.

Buettner testified that defendant told him that he had worked at “Bob’s Liquor Store,” but Buettner could not verify that such a place existed. Defendant also claimed to have worked for a company selling cable boxes, but Buettner could not verify that. In the summer of 1986, defendant worked in a summer youth program. 

Buettner learned that defendant had epilepsy and verified that defendant took Phenobarbital and Depakote. Defendant said that in recent years he experienced seizures only twice a year while on that medication. Buettner did not discover any history of alcohol or drug abuse by defendant. Defendant told Buettner that there was no history of mental illness in his family. Defendant did not have an adult criminal record, and had one delinquency incident when he was 14 years old. At that time, defendant was charged with burglary and placed on two years’ probation. Defendant successfully completed the probation.

Cheryl Prost, a psychological consultant for the 20th Judicial Circuit, testified that she had been employed in that capacity for 19 years. Prost had a bachelor’s degree in psychology and a master’s degree in clinical psychology. She had also completed a year of doctoral work in psychology. She was ordered by the court to evaluate defendant. The evaluation took place at the St. Clair County jail and was conducted on days that defendant’s jury trial was underway. Prost testified that she gave defendant the Wechsler Adult Intelligence Scale tests, a short reading test, tests to determine eye motor coordination and visual memory problems, and a clinical analysis questionnaire.

Prost testified that the testing conditions were not good. She had to work around defendant’s trial, so the testing began as early as 6:15 a.m., there were interruptions from jail guards, and there was a lot of noise in the background. Defendant tried very hard to pay attention to what was going on and to shut out the noise. Prost believed that the test conditions might have caused defendant’s scores on the Wechsler test and the reading test to be slightly lower than they otherwise would have been. Prost discussed defendant’s educational background with him and learned that he had been in learning disability classes.

Prost explained that the results of the Wechsler test showed defendant’s verbal IQ to be 75, which is in the middle of the borderline range of mental retardation. Defendant’s performance IQ is 79, which is still in the borderline range of mental retardation, but is close to the dull-average range. Defendant’s full scale IQ score was 76, which is in the borderline range of mental retardation. The range of mild mental retardation is 60 to 69. Borderline mental retardation is 70 to 79, and dull average is 80 to 89.

Prost elaborated on defendant’s defendant’s verbal IQ score, explaining that it is based on six subtests. An average score on any of these tests would be a 10, and anything below a 7 would indicate a serious problem area. Defendant’s scores were as follows: 3 on the information subtest, which tests academic information that one would pick up from being in class; 7 on the digit span, which is remembering a series of numbers forwards and backwards; 4 on vocabulary definitions; 6 on the arithmetic test; 8 on the comprehension section; and 5 on similarities, which compares two objects and asks how they are the same. 

Prost further testified about defendant’s reading difficulties. She administered the Wide Range Achievement test, and it showed that defendant’s reading level was fourth grade, first month. According to Prost, a fifth grade reading level is normally necessary to perform daily business. Defendant labored over the clinical analysis questionnaire questions, but he seemed able to comprehend them if given adequate time to do so. Defendant tested negative for any visual memory impairment or dyslexia.

Prost testified that the clinical analysis questionnaire, which she administered to defendant, asks 148 true/false questions about what a person is like or what types of experiences a person has. Defendant scored highly on five out of the six scales for depression. The tests showed that he felt anxiety and felt physically unwell at times. Prost reiterated that defendant was instructed to answer the questions based upon how he felt before he was arrested. Prost testified that defendant’s answers on the clinical analysis questionnaire showed that he was not having delusions, hallucinations, or strange experiences. Prost’s psychological report was admitted into evidence.

Defendant’s mother, Irene Mitchell, testified that defendant was 20 years old, the youngest of her six children. Defendant always minded her when he was growing up and never talked back. She had never had any discipline problems with defendant. Defendant’s father, Aber Mitchell, had worked at Olin Brass in East Alton, but the family was poor. Irene stayed home to raise the children. Aber was now deceased, as were all of defendant’s grandparents.

Irene testified that defendant suffered from epilepsy. Defendant suffered a head injury when he was around five years old and was playing Superman with his brother. Defendant’s foot slipped, and he hit his head on the rail of the bed. Defendant received stitches, and began having seizures seven months after the incident. The seizures are ongoing, and defendant has been treated for the seizures many times. Defendant initially took Dilantin for the seizures, but it did not control them sufficiently. Defendant’s medications were switched to “Depakene” and phenobarbital, and these worked better.

Irene testified that the children in the neighborhood loved defendant because he “trained them to do flips, acrobats and things like that, and they just love Anthony, all of them.” Defendant trained his dog, Poochie, very well, and appeared on a TV show, in which he demonstrated how he and his dog would do flips together. 

Irene clarified that defendant’s juvenile conviction was for an incident in which defendant and five other kids broke into an empty house by going through a window. Defendant successfully completed probation and had no other encounters with the legal system.

Defendant did volunteer work with senior citizens in East St. Louis. He was going to school there for reading, and became good enough to help out some of the senior citizens. Irene testified that the senior citizens were crazy about defendant. Defendant attended church regularly at the New Bethlehem church.

Irene testified that defendant had learning difficulties and had a home tutor for two years. Defendant was having seizures, and Irene did not want him to miss too much school because his grades were already bad. A tutor came to defendant’s home every day, which was the home bound instruction to which Buettner referred. Irene testified that, during that period, defendant missed a lot of school because of his seizures.

Irene further testified that defendant got along well with his siblings and that he had close friends, some of whom testified on his behalf during the trial. Defendant had recently worked at Bob’s, which is a confectionary and variety store. The year before, defendant had worked at the Chrysler plant in St. Louis. Defendant was also taking courses at a police academy school in St. Louis; defendant had passed a course to become a security guard.

In the State’s closing argument, the assistant State’s Attorney argued that none of defendant’s mitigating evidence was sufficient to preclude the death penalty. The State pointed out that defendant had had contacts with the criminal justice system, had not worked, was borderline mentally retarded rather than mentally retarded, and was not suffering from mental illness.

The State acknowledged that it did not put on additional aggravating evidence, but rather focused on the violent nature of the crime. The assistant State’s Attorney noted that defendant armed himself with a knife, went into the Lieneke’s trailer and stabbed 18-year-old David, and then pursued 13-year-old Dawn into the bedroom and stabbed her seven times as she cowered under the covers with the telephone in her hand. He asked the jury to consider the terror that would have gone through the victims’ minds, and that defendant’s attack upon them was unprovoked and brutal.

Defendant’s attorney began by reminding the jurors that if even one of them felt there were mitigating factors sufficient to preclude the imposition of the death penalty, the defendant’s life could be spared and that he would be sentenced to a term of natural life imprisonment. Defense counsel reminded the jury that either sentence was very severe, and that at best the 20-year-old defendant would be spending the rest of his life in prison. He emphasized that the State had the opportunity to present additional aggravating evidence but had not produced any.

Defense counsel then asked the jury to consider that defendant was mildly mentally retarded or borderline mentally retarded. Defense counsel further argued that defendant was only 20 years old and had a family who loved him.

Defense counsel also pointed out that defendant’s one contact with the criminal justice system occurred when he was 14 years old and was not significant. Defense counsel went on to talk about defendant’s seizure disorder, that defendant had grown up poor, and had only a fourth-grade reading level. He emphasized that the cumulative nature of this evidence, and that the alternative to death was natural life imprisonment, showed that the death penalty was not appropriate in this case.

Analysis

Against this backdrop, we consider the additional mitigating evidence that defendant now contends should have been presented. Defendant first contends that the jury did not receive accurate and comprehensive information about his intellectual functioning. Defendant criticizes trial counsel’s reliance on Prost’s report. Defendant relies on an affidavit from Dr. Michael Gelbort, who is critical of Prost’s work in this case. Gelbort, a clinical psychologist, tested defendant at the Menard correctional center and determined that defendant’s verbal IQ was 73, his performance IQ was 75, and his full scale IQ was 73. Gelbort determined that defendant’s math skills were at a fourth-grade level and that his reading and spelling skills were below the third-grade level. Gelbort characterized defendant as having a severe language-based learning disability. Gelbort concluded that defendant’s cognitive abilities were limited and that, although defendant’s IQ scores showed that he was borderline mentally retarded, his inability to read and his slowed information-processing speed left him functioning more like someone in the mildly to mild/moderately impaired range.

We need not determine whether counsel’s performance was objectively unreasonable under the first prong of the 
Strickland
 test, because defendant clearly cannot meet the second prong. The jury was informed of defendant’s borderline retardation, and his severe difficulties with reading and learning and did not find that those factors mitigated against imposition of the death penalty. There simply is no reasonable probability that, had the jury known that defendant’s IQ score might have been three points lower, that he actually read at below the third-grade level rather than at the fourth-grade level, and that a psychologist believed that the combination of his reading difficulties and low IQ left him functioning more in the mildly impaired range, it would have reached a different conclusion.

Defendant next argues that counsel minimized his seizure disorder to the point of insignificance and should have introduced more evidence on how it affected his day-to-day life. The jury learned that defendant had been suffering from epilepsy since he was a young child, that he initially took Dilantin, and then switched to Depakote and Phenobarbital when that was ineffective. Even with the Depakote and Phenobarbital, defendant was still suffering seizures twice a year. Defendant had been treated many times for his seizures, and they caused him to miss so much school that he had to get a home tutor. We do not agree that defense counsel’s evidence minimized defendant’s seizures to the point of insignificance.

Defendant claims that counsel should have introduced testimony from defendant’s sisters, who could have testified about what defendant’s seizures were like, how he had to be hospitalized for them many times, and how he missed school because of them. We believe this evidence would have been cumulative and there is no reasonable probability that additional testimony on this matter would have caused the jury to conclude that defendant’s epilepsy was a mitigating factor sufficient to preclude the death penalty.

Defendant also claims that defense counsel should have introduced evidence such as that found in Gelbort’s report that defendant sometimes had to go without his epilepsy medication as a child when the family could not afford it. Defendant points out that O’Donnell stated in his report that withholding medication in an epileptic patient can cause anxiety and apprehension. As there is no evidence that defendant was without his medication at or near the time of the murders, we do not believe defendant has shown there is a reasonable probability that the jury would have reached a different result based on this evidence. 

Defendant next contends that defense counsel was ineffective for failing to introduce evidence that, because of his learning disabilities and illnesses, defendant was victimized throughout his youth. According to defendant’s brief, defendant was “continually degraded, humiliated, and subjected to the violence of bullies, in and out of school.” Defendant’s argument is based on the hearsay statements of defendant’s friend, Eric Nicholson, which are contained in a mitigation report prepared by social worker Jeffrey Eno. According to Eno’s report, Nicholson told him that defendant was laughed at by his peers and was picked on by other students. Nicholson recalled an incident in which another student put a choke hold on defendant. Nicholson also stated that defendant’s second-grade teacher, Ms. Davis, viciously ridiculed defendant for his inability to read up to grade level. Another childhood friend, Carlos Lumas, told Eno that other kids in the neighborhood picked on defendant and asked him to spell the word “tree.” Defendant told Eno that he was the target of gangs who would beat him up and try to recruit him, but that he successfully resisted their efforts.

On this issue we do not believe that defendant can meet the first prong of the 
Strickland
 test. Defendant has not shown that counsel’s decision not to present evidence of defendant’s turbulent childhood fell below an objective standard of reasonableness. As we noted in 
People v. Sanchez
, 169 Ill. 2d 472, 491 (1996), evidence of a violent and abusive childhood is not inherently mitigating. Here, it appears that defense counsel’s strategy was to portray defendant as a pleasant person who was well-liked, who got along with other children in the neighborhood and taught them to do acrobatic tricks, who had close friends, and who volunteered his time to help others. It was not an objectively unreasonable strategy for defense counsel to emphasize this evidence rather than to portray defendant as an outcast and a loner who was picked on and beaten up. Defendant has not shown that his attorney’s performance in this regard fell below an objective standard of reasonableness.

Finally, defendant claims that the jury never received information about defendant’s history of depression and “other possible indicators of neurological/organic brain impairment.” Defendant points out that Gelbort observed that defendant’s mood was consistent with a reactive type of depression, and that, in 1983, defendant was diagnosed with childhood depression. Defendant also argues that several factors indicated that he had a neurological impairment, including a complicated birth, loss of consciousness after a head injury, another incident of blunt head trauma, possible lead intoxication, seizures, and a learning disability.

Again, defendant cannot meet the second prong of the 
Strickland
 test. Defendant’s claim that the jury received no information about his depression is untrue. Prost testified that defendant’s tests showed that he scored highly for depression on five out of six scales, and that he suffered from anxiety. The evidence also showed that defendant suffered from neurological impairment. It was established that defendant suffered from epilepsy following a head injury, that he had a learning disability, that he had difficulty reading, and that his IQ was in the borderline range for mental retardation. The jury rejected these factors as sufficiently mitigating to preclude the death penalty, and defendant has not established a reasonable probability that additional evidence on these matters would have changed that result.

We have carefully considered all of the evidence that defendant argues counsel was ineffective for not presenting in mitigation at his capital sentencing hearing. Defendant cannot meet both prongs of the 
Strickland
 test with any of this evidence. Accordingly, he has not made a substantial showing of the denial of the right to the effective assistance of counsel, and the trial court properly dismissed this count of the petition without an evidentiary hearing.

Adequacy of Post-Conviction Representation

Finally, defendant asks us to remand this cause to allow different attorneys to replead his petition. According to defendant, the petition’s shortcomings are such that it does not comply with either Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)), or the right to a reasonable level of assistance (see 
People v. Flores
, 153 Ill. 2d 264 (1992)). Defendant notes that his attorneys filed the original petition on December 7, 1993, but asked for an extension of time to complete additional investigation and discovery. Over the next 2½ years, the circuit court allowed the attorneys several more extensions. They filed an amended petition on May 16, 1996, that raised three new claims, and attached the mitigation report of social worker Jeffrey Eno. However, the amended petition was largely the same as the original petition, and the three new claims covered barely more than two pages of the petition. Defendant argues that it is now apparent that his attorneys did nothing for 2½ years but wait for a mitigation report, and then failed to incorporate adequately that report into the claims. 

Defendant acknowledges that there is no sixth amendment right to the effective assistance of counsel in state post-conviction proceedings. Defendant’s right to counsel in post-conviction proceedings is statutory, and that right is the right to a reasonable level of assistance. 
Flores
, 153 Ill. 2d at 276. Here, defendant’s attorneys clearly provided a reasonable level of assistance. They filed a lengthy post-conviction petition raising 17 new claims of deprivations of constitutional rights. The petition was supported by 47 exhibits. We not believe that their representation was unreasonable merely because the only additional evidence they came up with in 2½ years was a mitigation report. 

Defendant contends that his attorneys did not meet their obligations under Rule 651(c). The State counters that Rule 651(c) applies only to defendants who file 
pro se
 petitions and does not apply when the original petition is filed by an attorney. Here, the provision of Rule 651(c) that defendant claims was not complied with was the one requiring the petitioner’s claims to be shaped into appropriate legal form. The clause defendant refers to is the one requiring counsel to affirm that he “has made any amendments to the petitions filed 
pro se
 that are necessary for an adequate presentation of petitioner’s contentions.” 134 Ill. 2d R. 651(c). As defendant did not file a 
pro se
 petition, his attorneys could not have violated that provision. Moreover, we find that petitioner’s claims are in appropriate legal form.

As a final matter, we note that defendant argues that counsel’s deficiencies prejudiced him particularly with respect to his second, third, and fourth appellate arguments. No additional evidence or pleading would have helped defendant on these arguments. As to the second appellate argument, even if it could have been conclusively established that Douglas was the only person who told the police where the items of physical evidence could be found, the police would have inevitably spoken to Douglas and found that evidence. Regarding the third argument, that argument is irrelevant in light of our holding that any error in the admission of defendant’s confession was harmless. Defendant waived the fourth argument by failing to raise it on direct appeal. We decline defendant’s invitation to remand this matter for repleading of the post-conviction petition.

CONCLUSION

Defendant’s post-conviction petition, supported by the accompanying exhibits and the trial record, does not make a substantial showing that defendant’s constitutional rights were violated. Accordingly, the court did not err in dismissing the petition without an evidentiary hearing. The judgment of the circuit court of St. Clair County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 24, 2000, as the date on which the sentence of death entered in the circuit court is to be imposed. Defendant shall be executed in the manner provided by law (725 ILCS 5/119–5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

 

Judgment affirmed.

JUSTICE MILLER, specially concurring:

I join the majority opinion. I write separately to respond to several points raised by the dissenting opinion in this case.

Notably, the dissent musters only a brief defense of 
People v. Brandon, 
162 Ill. 2d 450 (1994), and its progeny, and their interpretation of section 104–21(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a)). The dissent offers no new analysis of the question and simply perpetuates the erroneous premise of the 
Brandon
 line of cases by equating the statutory right found in section 104–21(a) with the distinct constitutional right not to be tried while unfit, as embodied in the due process clause. Too, the dissent takes issue with what it insists are inconsistencies in the views of the justices who disagreed with the Brandon rule and who questioned the court’s efforts to transmute a statutory right into a constitutional one. What the dissent’s lengthy discussion fails to mention, but is evident from even a cursory reading of the earlier cases, is that the majority opinions themselves evolved and changed focus, as the court considered different aspects of the problems posed by its application of the 
Brandon 
rule in different procedural contexts. The dissents to those decisions appropriately addressed the specific factual settings in which the issue then happened to arise.

In support of the 
Brandon
 rule, the dissent relies primarily on the doctrine of
 stare decisis
 as grounds for leaving that line of authority undisturbed. Our departure from 
stare decisis
 finds ample justification here, however. The earlier cases attest to the continuing problems the 
Brandon 
rule produced as the court labored to provide the statutory right with a constitutional foundation. Considerations of 
stare decisis 
should weigh little in these circumstances, where a misguided interpretation of a procedural statute threatened to become a permanent and curious feature of our constitutional law. Relevant here are the concerns expressed by the Supreme Court in 
Payne v. Tennessee
, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), when it overruled part of its four-year-old decision in 
Booth v. Maryland
, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987), which had barred the use of victim impact evidence at capital sentencing hearings. The Court noted the importance normally played by 
stare decisis 
in our system of justice but also recognized that the doctrine does not mean that a precedent must remain forever frozen in the law:

“Adhering to precedent ‘is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right.’ [citation.] Nevertheless, when governing decisions are unworkable or are badly reasoned, ‘this Court has never felt constrained to follow precedent.’ [Citation.] 
Stare decisis 
is not an inexorable command; rather, it ‘is a principle of policy and not a mechanical formula of adherence to the latest decision.’ [Citation.] This is particularly true in constitutional cases, because in such cases ‘correction through legislative action is practically impossible.’ [Citation.] Considerations in favor of 
stare decisis 
are at their acme in cases involving property and contract rights, where reliance interests are involved [citations]; the opposite is true in cases such as the present one involving procedural and evidentiary rules.” 
Payne, 
501 U.S. at 827-28, 115 L. Ed. 2d at 737, 111 S. Ct. at 2609-10.

As 
Payne 
instructs, the doctrine of 
stare decisis 
is not intended to permanently enshrine an incorrect rule of law, isolating it forever from review and reconsideration. “
Stare decisis 
is an important factor in the judicial process, but we must not forget that it is not the whole process.” 
Nudd v. Matsoukas, 
7 Ill. 2d 608, 615 (1956). The rule first announced by the court in 
Brandon 
and later applied in a variety of circumstances mistakenly confused a statutory right with a constitutional right. It is not too late to correct that erroneous interpretation. The surprising thing in all of this is not that the court now decides to overrule 
Brandon 
and its progeny, but that those cases managed to survive as long as they did.

JUSTICES BILANDIC and HEIPLE join in this special concurrence.

JUSTICE FREEMAN, dissenting:

I respectfully dissent from the court’s decision to overrule 
Brandon
 and its progeny.

Prior to today, our case law had been settled as to what remedy would be afforded to a defendant who was entitled, under section 104–21(a) (Ill. Rev. Stat. 1989, ch. 38, par. 104–21(a)), to a fitness hearing, but who did not receive one. Specifically, that case law dictated that the failure to hold the hearing necessitated reversal of the defendant’s convictions and remandment for further proceedings, unless it could be established that defendant did not suffer mental impairment as a result of his ingestion of psychotropic medication. 
People v. Neal
, 179 Ill. 2d 541 (1997); 
People v. Burgess
, 176 Ill. 2d 289 (1997) (modifying 
People v. Brandon
, 162 Ill. 2d 450 (1994)). This rule applied to cases on direct appeal as well as to those on collateral review. 
Neal
, 179 Ill. 2d at 549 (modifying 
People v. Nitz
, 173 Ill. 2d 151 (1996)). Indeed, the parties in this appeal have framed their contentions regarding this issue in light of the principles set forth in these cases. Neither defendant nor the State has, in this appeal, requested that this court revisit the 
Brandon/Burgess
 rationale. The State only asks that this court consider the retroactivity of the above rule in light of the retroactivity test announced by the United States Supreme Court in 
Teague v. Lane
, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989), and adopted by this court in 
People v. Flowers
, 138 Ill. 2d 218 (1990). The court, however, states that it “need not address this issue, however, [because] the dismissal of defendant’s psychotropic medication claims was proper for other reasons.” Slip op. at 7. The “other reasons” alluded to in this sentence eventually reveal themselves to be nothing other than the court’s disregard of the doctrine of 
stare decisis
. Contrary to the views expressed in today’s opinion, no legitimate reason exists in this case that warrants a departure from 
stare decisis
. I, therefore, believe that this court should continue to adhere to its established precedent in this area.

I

The term 
stare decisis
 is derived from the Latin phrase 
stare decisis et non quieta moevre
, which translates “ ‘to stand by matters that have been decided and not to disturb what is tranquil.’ ” J. Wallace, 
Stare Decisis and the Rehnquist Court: The Collision of Activism, Passivism and Politics in Casey
, 42 Buff. L. Rev. 187, 189 (1994), quoting Dictionary of Foreign Phrases and Abbreviations 187 (K. Guinach trans., 3d ed. 1983). This principle was engrafted in English jurisprudence, having been recognized by Sir William Blackstone, who acknowledged that “ ‘precedents and rules must be followed, unless flatly absurd or unjust.’ ” J. Stein, 
The Hobgoblin Doctrine: Indentifying “Foolish” Consistency in the Law
, 29 Tex. Tech. L. Rev. 1017, 1019 (1998) quoting 1  W. Blackstone, Commentaries *70. In American jurisprudence, 
stare decisis
 reflects a “ ‘policy judgment that “in most matters it is more important that the applicable rule of law be settled than that it be settled right.” ’ ” 
State Oil Co. v. Khan
, 522 U.S. 3, 20, 139 L. Ed. 2d 199, 212-13, 118 S. Ct. 275, 284 (1997), quoting 
Agostini v. Felton
, 521 U.S. 203, 235, 138 L. Ed. 2d 391, 422, 117 S. Ct. 1997, 2016 (1997), quoting 
Burnet v. Coronado Oil & Gas Co.
, 285 U.S. 393, 406, 76 L. Ed. 815, 823, 52 S. Ct. 443, 447 (1932) (Brandeis, J., dissenting, joined by Roberts and Cardozo, JJ.). As the United States Supreme Court has observed, the judiciary prefers this doctrine because it “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” 
Payne v. Tennessee
, 501 U.S. 808, 827, 115 L. Ed. 2d 720, 737, 111 S. Ct. 2597, 2609 (1991).

This court, too, has voiced similar sentiments. Long ago in 
Prall v. Burckhartt
, the court observed that the rule of 
stare decisis

“is founded largely on considerations of expediency and sound principles of public policy, it being indispensable to the due administration of justice, especially by a court of last resort, that a question once deliberately examined and decided should be considered as settled and closed to further argument, and the courts are slow to interfere with the principle announced by the decision and it may be upheld even though they would decide otherwise were the question a new one.” 
Prall v. Burckhartt
, 299 Ill. 19, 41 (1921).

In light of the foregoing, this court has recognized that the doctrine, while not inviolable, demands that it be overturned “only on the showing of good cause.” 
Heimgaertner v. Benjamin Electric Manufacturing Co.
, 6 Ill. 2d 152, 167 (1955). In my view, my colleagues have not shown any cause, let alone good cause, for their actions today.

Purporting to appreciate the considerations noted above, the court states that “normally” it “would continue to adhere to *** established precedent, even if certain members of this court disagreed with it.” Slip op. at 18. Nevertheless, the court explains that “[i]n this case, however, we deem it appropriate to depart from 
stare decisis
 [because] *** [n]o reasonable observer of this court’s jurisprudence could argue that the law in this area has been developing in a principled and intelligible fashion.” Slip op. at 18.  I take this statement to refer to this court’s decision, in 
People v. Burgess
, 176 Ill. 2d 289 (1977), to change from a bright line, automatic rule of reversal to a case-specific approach. I cannot fathom how Justice Miller can join in an opinion that characterizes this change as unprincipled and unintelligible because Justice Miller himself authored 
Burgess
. The case law that the court today characterizes as “erratic and confused” is, in reality, neither. None of the parties in this case appear to be confused; rather, both defendant and the State have presented cogent arguments grounded in the law as it existed up until today. Likewise, the various districts of our appellate court have rendered opinions in this area that do not exhibit any degree of chaos with respect to this issue. The only people who are “confused” by this case law are those members of this court who do not like it and have resisted its consistent application as the law of this state.

Although I acknowledge that 
stare decisis
 is applied less rigidly in constitutional cases (see 
Patterson v. McLean Credit Union
, 491 U.S. 164, 172-73, 105 L. Ed. 2d 132, 148, 109 S. Ct. 2363, 2370 (1989)), the United States Supreme Court has noted that the doctrine is so persuasive that, even in constitutional cases, the Court has required a departure from precedent to be supported by some “special justification.” 
Arizona v. Rumsey
, 467 U.S. 203, 212, 81 L. Ed. 2d 164, 172, 104 S. Ct. 2305, 2311 (1984). I must point out that our prior case law in this area did not produce an “unworkable”or problematic application of the law to defendants. See 
Payne v. Tennessee
, 501 U.S. 808, 842-43, 115 L. Ed. 2d 720, 746-47, 111 S. Ct. 2597, 2617-18 (1991) (Souter, J., concurring, joined by Kennedy, J.) (recognizing that constitutional error in past decisions alone is not reason to override 
stare decisis
, but rather needs “special justification”). My review of the appellate court decisions that have cited to 
Brandon
 and 
Burgess
 reveals that the lower courts have not had any difficulty in applying the case-specific approach established in 
Burgess
 and utilized by this court in our decisions which postdate it.

In order to understand how our case law has evolved since the time 
Brandon
 was announced, a complete review of the history of this court’s psychotropic drug jurisprudence is necessary. This review will illustrate that nothing has changed from the time that 
Brandon
 was modified by the court’s decision in 
Burgess
, except for the fact that one member of the court that decided 
Brandon
 has retired. However, the circumstances that warrant changes in the law do not include changes in personnel of the court. As Justice Ryan once eloquently stated, “[i]f the law were to change with each change in the makeup of the court, then the concept that ours is a government of law and not of men would be nothing more than a pious cliche.” 
People v. Lewis
, 88 Ill. 2d 129, 167 (1981) (Ryan, J., concurring).

A

One of the most basic tenets of our criminal justice system is the recognition that the conviction of an incompetent defendant violates that defendant’s fundamental right to due process. 
Pate v. Robinson
, 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838 (1966); 
People v. Barkan
, 45 Ill. 2d 261, 263 (1970); 
People v. Burson
, 11 Ill. 2d 360, 368 (1957) (and cases cited therein). The constitutional right derives from the notion, recognized at common law, that no person should be compelled to stand trial while insane. 
People v. Gavrilovich
, 265 Ill. 11 (1914). As this court has recognized, the need for inquiry into fitness at the time of trial stems from concerns that an incompetent defendant may be disabled from making a rational defense and may be incapable “of co-operating with his counsel to the end that any available defenses may be interposed.” 
Burson
, 11 Ill. 2d at 369. Moreover, in the Code of Criminal Procedure of 1963, the Illinois General Assembly has expressly prohibited the trial, adjudication, sentence, or execution of person charged with a criminal offense while insane. See 725 ILCS 5/104–10 
et seq.
 (West 1996). The statute, however, does not, and was not intended to, abrogate the common law rule. 
Burson
, 11 Ill. 2d at 368.

The Code of Criminal Procedure provides that the issue of a defendant’s fitness to stand trial, to plead, or to be sentenced may be raised by the defense, the State or the court at any appropriate time before a plea is entered or before, during, or after trial. 725 ILCS 5/104–11(a) (West 1996). Prior to December 28, 1979, our Criminal Code provided that, when a 
bona fide
 doubt of a defendant’s fitness has been raised, the court shall order a determination of the issue before proceeding further. 725 ILCS 5/104–11(a) (West 1996). This court strictly construed these statutory provisions to mean that whenever the court becomes aware of facts that raise a 
bona fide
 doubt as to sanity, the court becomes duty-bound to “cause a sanity hearing to be held as provided by law.” 
Burson
, 11 Ill. 2d at 370.

The failure to hold a fitness hearing once a 
bona fide
 doubt as to competence has been raised has long been deemed reversible error. See 
Burson
, 11 Ill. 2d at 370. The failure to make the requisite inquiry has been regarded as so fundamental to the right to a fair criminal trial that it can be raised as an issue on appeal despite a defendant’s failure to properly preserve it. This court’s decision in 
Burson
 is illustrative in this respect. The court there reversed a criminal conviction because the trial court did not hold the sanity hearing that was required by the Criminal Code. The court did so even though the defendant

“did not present or argue this point; and that the general rule is that where a question is not raised or reserved in the trial court, or where, though raised in the lower court, it is not urged or argued on appeal, it will not be considered and will be deemed to have been waived. However, this is a rule of administration and not of jurisdiction or power, and it will not operate to deprive an accused of his constitutional rights of due process. ‘The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented.’ ” 
Burson
, 11 Ill. 2d at 370-71, quoting 3 Am. Jur. 
Appeal & Error
 §248, at 33 (1937).
(footnote: 5)
In view of the foregoing, it is clear that this court has long acknowledged that the deprivation of the sanity hearing required by the statute was, in essence, a violation of constitutional due process. See also 
Riggins v. Nevada
, 504 U.S. 127, 140, 118 L. Ed. 2d 479, 492, 112 S. Ct. 1810, 1817-18 (1992) (Kennedy, J., concurring) (noting that a defendant’s waiver of the right to be tried while competent would not withstand scrutiny under the Due Process Clause and casts doubt on his or her exercise or waiver of all subsequent rights and privileges through the whole course of the trial). Moreover, this court has held that such a claim is cognizable on collateral review. See 
People v. Smith
, 44 Ill. 2d 82, 85 (1969) (noting that successful petition must allege facts which “demonstrate that such a hearing should have been had”).

On December 28, 1979, the General Assembly amended the Code of Criminal Procedure to address the issue of psychotropic drugs. Such drugs, also known as antipsychotic drugs, were first introduced in the 1950s and have since gained wide acceptance in the psychiatric community as treatment for psychotic thought disorders. See 
Riggins
, 504 U.S. at 141, 118 L. Ed. 2d at 493, 112 S. Ct. at 1818 (Kennedy, J., concurring). Although these drugs worked to restore normal thought processes by clearing hallucinations and delusions, they also had unwanted side effects, namely, slowed physical and mental functioning. These side effects are severe enough to have caused one member of the United States Supreme Court to acknowledge that ingestion of the drugs by a criminal defendant can cause prejudice to that defendant by rendering him or her unable or unwilling to assist counsel. See 
Riggins
, 504 U.S. at 141-42, 118 L. Ed. 2d at 493-94, 112 S. Ct. at 1818-19 (Kennedy, J., concurring). Our General Assembly recognized the adverse effect these types of drugs could have on the competency of an accused and amended the Criminal Code to provide that

“[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication.” 725 ILCS 5/104–21(a) (West 1992).

The first reported Illinois decision that addressed this amendment was 
People v. Tilson
, 108 Ill. App. 3d 973 (1982). There, defendant Tilson contended that his conviction must be reversed because the circuit court failed to hold the hearing provided for in section 104–21(a) despite the fact that defendant was taking a psychotropic drug under medical direction at the time of his trial. The appellate court rejected Tilson’s challenge, noting that the word “entitled” did not necessitate an obligation to hold the hearing. Further, the court did not view the statute as being indicative of an intent by the legislature to “remove the right of a trial judge to exercise all discretion when he is possessed of sufficient information to assure that the particular defendant is fit to stand trial and to be sentenced.” 
Tilson
, 108 Ill. App. 3d at 978. For this reason, the court concluded that the circuit court did not abuse its discretion in failing to hold the fitness hearing, 
sua sponte
, and affirmed the conviction. The holding in 
Tilson
 was followed in several other appellate court decisions, culminating in the general rule that a defendant’s ingestion of psychotropic medication was, in effect, but one factor in determining whether a 
bona fide
 doubt of a defendant’s competence exists. See, 
e.g.
, 
People v. Lopez
, 216 Ill. App. 3d 83, 87-88 (1991); 
People v. Balfour
, 148 Ill. App. 3d 215, 226 (1986).

Such was the state of Illinois’ decisional law on this issue when defendant Tyrone Brandon directly appealed his first degree murder conviction and death sentence to this court. 
People v. Brandon
, 162 Ill. 2d 450 (1994). In that appeal, this court was presented, for the first time, with a challenge to the trial court’s failure to hold a fitness hearing under section 104–21(a). In contrast to the appellate court decisions on this subject, the court concluded that section 104–21(a) “evinces a recognition by the General Assembly that psychotropic medication is an important signal that a defendant may not be competent to stand trial.” 
Brandon
, 162 Ill. 2d at 457. The court further concluded that Brandon’s trial attorney was ineffective for failing to point out to the trial court that Brandon was entitled to the hearing under section 104–21(a) and that the resulting prejudice was “manifest.” 
Brandon
, 162 Ill. 2d at 459. In so holding, four members of this court explicitly rejected the notion, first developed in 
Tilson
, that the fitness hearing described in section 104–21(a) was a matter of discretion with the trial court. 
Brandon
, 162 Ill. 2d at 459, citing 
Pate v. Robinson
, 383 U.S. 375, 386, 15 L. Ed. 2d 815, 822, 86 S. Ct. 836, 842 (1966). The court interpreted the word “entitled” to mean just that–if facts are brought to the court’s attention that indicate that defendant is taking psychotropic drugs under medical direction, then the court does not have the discretion to not hold the required hearing. 
Brandon
, 162 Ill. 2d at 459.

Justice Miller, joined by Justices Bilandic and Heiple, dissented in 
Brandon. 
Although the dissenting justices acknowledged that it was “true that the defendant was entitled to a fitness hearing under [section 104–21(a)],” they disputed whether defendant had established the requisite prejudice under 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). 
Brandon
, 162 Ill. 2d at 461-63 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).
(footnote: 6) According to the dissent, defendant Brandon could not establish prejudice for counsel’s failure to request a hearing under section 104–21(a) because defendant could not show that he was unfit. In other words, the dissent took the view that the hearing, had it been ordered, would have resulted in a finding that Brandon was fit for trial. 
Brandon
, 162 Ill. 2d at 461-63 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

This court’s decision in 
Brandon 
marked a departure, in several critical respects, from the previous reported appellate court decisions concerning the effect of a trial court’s failure to hold a fitness hearing pursuant to section 104–21(a). First, all seven members of the court embraced the notion that a defendant who is taking psychotropic drugs under medical direction is entitled to a hearing, for even the dissent conceded that proposition. Second, a majority of the court deviated from the appellate court’s holding that the decision to hold a fitness hearing pursuant to the statute rests within the discretion of the trial court.

Inexplicably, the court today holds that the word “entitle” does not mean what most people of average intelligence believe it to mean, namely, “to furnish with a right.” Indeed, the court goes to great lengths to explain that the word “entitle” does not mean that a court must make a “further inquiry” when certain facts are brought to the court’s attention. See slip op. at 12. I know of no rule of statutory construction which supports such a reading of this statute. The language of section 104–21(a) is exactingly clear: a defendant who is taking psychotropic drugs under medical direction at the time of trial has the right to have an inquiry into the issue of fitness. Under this statute, once a defendant is being treated with psychotropic drugs, he or she need not raise a 
bona fide
 doubt as to fitness in order to receive a hearing. The hearing is automatic. 
The statute does not say that the trial judge has discretion to hold such a hearing when a defendant is taking psychotropic drugs under medical direction. Nor does the statute limit such hearings to only those who “timely” request them. In fact, the Code of Criminal Procedure expressly allows for a post-trial inquiry into fitness. See 725 ILCS 5/104–11(a) (West 1996). Thus, section 104–21(a) was not couched in terms which would limit the circuit court’s ability to hold such a hearing, as today’s opinion suggests. If psychotropic drugs were being administered, a fitness hearing was to be held. The court in 
Brandon
 did not erroneously construe section 104–21(a).

After 
Brandon
 was announced, this court next addressed section 104–21(a) in 
People v. Gevas
, 166 Ill. 2d 461 (1995). Defendant Gevas appealed his conviction and death sentence to this court, arguing, among other things, that the trial court erred by not ordering a fitness hearing after learning that defendant was taking psychotropic drugs under medical direction. Relying on the decision in 
Brandon
, the court concluded that the trial court’s failure to hold the hearing necessitated reversal of the convictions and a new trial. The court held that, by enacting section 104–21(a), the General Assembly had “equated the administering of psychotropic medication to a defendant with a 
bona fide
 doubt as to fitness to stand trial.” 
Gevas
, 166 Ill. 2d at 469. In so holding, the court noted that the legislature’s concern in this area was substantial not only because such drugs signal that a defendant may not be competent to stand trial, but because these types of drugs can also “have severe side effects which can affect a defendant during criminal proceedings.” 
Gevas
, 166 Ill. 2d at 470. In support of this statement, the court cited Justice Kennedy’s concurrence in 
Riggins v. Nevada
, 504 U.S. 127, 144, 118 L. Ed. 2d 479, 495, 112 S. Ct. 1810, 1820 (1992) in which he pointed out that “[t]he side effects of antipsychotic drugs can hamper the attorney-client relation *** rendering the defendant less able or willing to take part in his defense [and] ‘can also lead to the defendant’s loss of self-determination undermining the desire for self-preservation which is necessary to engage the defendant in his own defense in preparation for his trial.’ ” Finally, the court concluded that remanding the matter for a retrospective fitness hearing would be inherently difficult. Therefore, the only proper remedy was a new trial. 
Gevas
, 166 Ill. 2d at 471.

Once again, Justice Miller, joined by Justices Bilandic and Heiple, dissented, this time on the basis that defense counsel’s failure to inform the trial judge sooner in the proceedings of defendant’s ingestion of psychotropic drugs was a matter of trial strategy. According to the dissent, the trial judge in the case “was warranted in concluding that the defendant was fit and was justified in refusing counsel’s untimely request for a hearing.” 
Gevas
, 166 Ill. 2d at 473 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). Moreover, the dissenting justices stated the following:

“If, as the majority insists, section 104–21(a) is to be applied in this case, then the proper course would be to remand for an evidentiary hearing to determine whether the defendant was still receiving drugs at the time of the plea hearing.” 
Gevas
, 166 Ill. 2d at 474 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

It was for these reasons that the dissenting justices believed that the court’s decision to grant defendant Gevas a new trial was erroneous.

This court was next presented with the psychotropic drug issue in 
Kinkead I
, 168 Ill. 2d 394, another capital case. Defendant Kinkead claimed that he was not afforded a fitness hearing despite the fact that he was taking psychotropic drugs at the time of the proceedings against him. The court began its analysis by reaffirming the principles established in both 
Brandon
 and 
Gevas
. Moreover, the court again rejected any notion that the ingestion of psychotropic medication was, in effect, but one factor in the trial court’s 
bona fide
 doubt analysis. 
Kinkead I
, 168 Ill. 2d at 409. The court specifically noted that the appellate court decisions relied upon by the State were all decided prior to 
Brandon
. The court further rejected the State’s contention that the trial court’s “observations of defendant’s demeanor during the proceedings [were] dispositive of the fitness issue in the case at bar.” 
Kinkead I
, 168 Ill. 2d at 409-10. In reaching this conclusion, the court specifically stated:

“We believe that the legislature intended, through the plain language of the statute, to remove the determination of a defendant’s fitness from the subjectivity of personal observation and place the question in the formal context of a fitness hearing. Psychotropic medications are potent drugs and their effect on the mind and behavior of an accused may not be easily determined or fully understood, particularly by nonmedical personnel. A fitness hearing provides the vehicle by which the court may ascertain whether the drugs are influencing the defendant’s subjective decision regarding the pursuit of available defenses.” 
Kinkead I
, 168 Ill. 2d at 410.

Nevertheless, the court noted that Kinkead’s situation was slightly different from that of the defendants in 
Brandon
 and 
Gevas
 because the record on appeal was inadequate–the court could not “determine whether the administration of the Thorazine was proximate enough in time to defendant’s guilty plea and sentencing to trigger the right to a full fitness hearing pursuant to section 104–21(a).” 
Kinkead I
, 168 Ill. 2d at 414. The matter was therefore remanded with directions that the circuit court conduct an inquiry into the factual circumstances surrounding defendant’s asserted use of psychotropic medication. 
Kinkead I
, 168 Ill. 2d at 417.

Again, Justice Miller, joined by Justices Bilandic and Heiple, dissented. Contrary to the view expressed in their 
Gevas
 dissent, the dissenting justices now took issue with remanding the matter for the factual inquiry. Compare 
Kinkead I
, 168 Ill. 2d at 418 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.), with 
Gevas
, 166 Ill. 2d at 474 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). Moreover, the dissenting justices disagreed with the conclusion that the legislature, through section 104–21(a), essentially equated the use of psychotropic drugs with the presence of a 
bona fide
 doubt concerning fitness. According to the dissent, a defendant may be entitled to a fitness hearing under the provision, but such a defendant must invoke the statute in “a timely manner.” 
Kinkead I
, 168 Ill. 2d at 419 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

The court next addressed the same issue in yet another capital case, 
People v. Birdsall
, 172 Ill. 2d 464 (1996). Defendant Birdsall contended, 
inter alia
, that he was denied due process of law and effective assistance of counsel because he was not afforded the competency hearing to which defendants are entitled by section 104–21(a) if they are taking psychotropic medication under medical direction at or near the time of trial or sentencing. The court noted that under long-established principles of due process, an accused may not be prosecuted or validly convicted if he or she is unfit to stand trial. 
Birdsall
, 172 Ill. 2d at 474-75. Moreover, to secure this due process protection, Illinois statutory and case law require a trial court to hold a competency hearing if there is a 
bona fide
 doubt concerning the defendant’s mental fitness to understand the nature and purpose of the proceedings and to assist in his or her defense. Citing the 
Gevas
 decision, the court noted that the legislature indicated through the plain language of section 104–21(a) that it had “equated the administering of psychotropic medication to a defendant with a 
bona fide
 doubt as to fitness to stand trial.” 
Birdsall
, 172 Ill. 2d at 475.
(footnote: 7) After a thorough review of Illinois law, the court concluded that Birdsall was entitled to relief based on the denial of his right to a fitness hearing, and a new trial was ordered. 
Birdsall
, 172 Ill. 2d at 475-77. Moreover, the court rejected the State’s explicit request that the court “repudiate” its holdings in 
Brandon
, 
Gevas
, and 
Kinkead I
. In place of the automatic reversal rule enunciated in 
Brandon
 and 
Gevas
, the State urged this court to adopt a totality of the circumstances test in which the court could assess whether the psychotropic drugs had impaired defendant’s fitness to understand and assist in his defense. The court declined the State’s request, noting that the State did not point to anything in the record on appeal that contained any evidence of a medical nature respecting the influence the drugs may have had on Birdsall. 
Birdsall
, 172 Ill. 2d at 477-79.

Justice Miller, again with Justices Bilandic and Heiple joining, dissented. Once more, the dissenting justices charged that the court was mistakenly equating the statutory entitlement to a fitness hearing found in section 104–21(a) with a 
bona fide
 doubt of the defendant’s fitness. The dissent also believed that the court had confused “defendant’s failure to assert the procedures it believes are designed to secure due process with a denial of due process itself.” 
Birdsall
, 172 Ill. 2d at 482 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). According to the dissent, section 104–21(a) “grants to a defendant an entitlement to a fitness hearing in cases in which the constitutional right is not at all implicated.” 
Birdsall
, 172 Ill. 2d at 482 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). The dissenting justices also maintained that “[r]ather than being a question of due process, the issue is properly analyzed in terms of ineffective assistance of counsel.” 
Birdsall
, 172 Ill. 2d at 482 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). In order to establish prejudice, a defendant must show not only that a fitness hearing would have been conducted if requested, but defendant must also demonstrate that the outcome of the hearing would have been favorable to him.

Up until 
Birdsall
, all of this court’s decisions which had addressed the psychotropic drug issue had done so in the context of a direct appeal from trial. In 
People v. Nitz
, 173 Ill. 2d 151 (1996), the court faced the same question in the context of collateral review. Defendant Nitz sought relief under the Post-Conviction Hearing Act, asserting that his murder convictions and death sentence were obtained in violation of his federal and state constitutional rights. Nitz contended that he was entitled to a new trial because the State withheld information that it was administering psychotropic medication to him throughout the course of this trial and sentencing. According to Nitz, the State’s failure to disclose the information deprived him of his constitutional due process right to a fitness or competency hearing. The court began its analysis of defendant’s contention by examining the nature and scope of the due process right in the context of an accused’s competency to stand trial, noting that the failure to observe procedures adequate to protect a defendant’s right not to be tried while unfit deprived the defendant of due process. 
Nitz
, 173 Ill. 2d at 156. The court then cited several cases, decided before the enactment of section 104–21(a), that held that if facts existed at the time of defendant’s trial which, if presented to the trial court, would have raised a 
bona fide
 doubt as to defendant’s sanity, the accused would have had a right to have a hearing and that such a claim could be heard on collateral review. See 
Nitz
, 173 Ill. 2d at 157 (citing 
People v. Smith
, 44 Ill. 2d 82 (1969), 
People v. McLain
, 37 Ill. 2d 173 (1967), and 
People v. Harris
, 113 Ill. App. 3d 663 (1983)). Recognizing the due process implications of Nitz’s claim, the court went on to evaluate it in light of 
Brandon
 and its progeny. Although the court noted that the procedures contained in the Code of Criminal Procedure regarding fitness were purely statutory, the court held that the right to inquiry established in the Code, be it through 
bona fide
 doubt or be it through the ingestion of psychotropic drugs, flows from the due process guarantee that an accused who is unfit will not be tried. 
Nitz
, 173 Ill. 2d at 160-61. Moreover, the court rejected the State’s contention that Nitz’s demeanor at trial was dispositive of the issue, noting that the court had previously rejected similar arguments in 
Brandon
, 
Gevas
, and 
Kinkead I.
 The court also rejected the State’s invitation to overturn the “automatic reversal” rule enunciated in 
Brandon
 and the cases which followed it. 
Nitz
, 173 Ill. 2d at 163. Noting that an “automatic reversal” has always been the appropriate remedy where a requisite statutory fitness hearing was not provided, the court concluded that Nitz was entitled to a new trial. 
Nitz
, 173 Ill. 2d at 164. In other words, the court in 
Nitz
 held that the failure to hold the required hearing under section 104–21(a) necessitated the same type of relief as did the failure to hold a hearing under section 104–11(a).

Justice Miller, joined by Justices Bilandic and Heiple, again dissented. The dissenting justices continued to adhere to the notion that the right to the hearing established in section 104–21(a) could not be equated with a 
bona fide
 doubt of fitness. In addition, the dissent believed that the right provided in section 104–21(a) was statutory as opposed to constitutional and, therefore, was not cognizable under the Post-Conviction Hearing Act. 
Nitz
, 173 Ill. 2d at 165 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

Nitz
 and the cases decided before it firmly established that due process considerations were at play in those cases in which a defendant was entitled to, but did not receive, a hearing under section 104–21(a) at the time of trial or sentencing. Under the guise of “correcting” “erroneous” precedent, the court today deprecates the constitutional right to be fit when tried. 
For example, the court insists that the failure to hold a section 104–21(a) hearing is merely a violation of a statute, stating that “[s]tatutes do not confer constitutional rights, and the allegation of a deprivation of a statutory right is not a proper claim under the Act.” Slip op. at 10. The court ignores the reality, just as the dissenters did in 
Nitz
, that the statutory provisions concerning fitness contained in our Code of Criminal Procedure implicate the fundamental constitutional right to be competent while tried. The court seems incapable of understanding that these psychotropic drug cases present, at root, the question of whether defendants were unfit when tried. If the answer to this question is yes, the conviction cannot stand because the “conviction of an accused person while he is legally incompetent violates due process.” 
Pate
, 383 U.S. at 378, 15 L. Ed. 2d at 318, 86 S. Ct. at 838.  The purpose of the post-conviction remedy is to provide a mechanism by which convicted persons could raise “the question of whether they were denied due process of law” at their original trials. 
People v. Dale
, 406 Ill. 238, 243 (1950). Our Post-Conviction Hearing Act was specifically designed to vindicate those constitutional rights that were not and could not have been raised at the time of trial.  In the psychotropic drug cases, the defendants are presenting evidence, which if known at the time of trial, would have necessitated that an inquiry be made into the issue of fitness. No inquiry was made in these cases; therefore, a possibility exists that the drugs that were being administered may have rendered some unfit. As noted, an accused who is unfit to be tried and is nevertheless convicted has been denied due process. That four members of this court fail to see the due process implications in such cases is incredulous.

Moreover, the court today mischaracterizes the facts in 
Nitz
. It must be remembered that, in that case, defendant Nitz 
alleged in his post-conviction petition that the State withheld from both defendant and his attorney the psychotropic nature of the drugs that were administered to defendant Nitz at the time of the trial. Clearly, had those facts been known to either defense counsel or the trial judge, the court would have been duty-bound to hold the hearing mandated by the statute. Therefore, the post-conviction act provided the only means by which defendant could vindicate his constitutional right to inquiry surrounding his competence. See 
People v. Smith
, 44 Ill. 2d 82 (1969) (acknowledging the cognizability on post-conviction of a claim regarding the failure of a court to hold a 
bona fide
 doubt hearing); J. Decker, 
“Last Chance” State Judicial Review in Criminal Cases–Illinios’ Collateral Attack Remedies: A Call For Principled Jurisprudence
, 38 DePaul L. Rev. 201, 271 (1988) (noting that competency to stand trial or to enter a plea is of constitutional magnitude and is an issue cognizable under the Illinois post-conviction hearing act). 

After 
Nitz
 was announced, the court next addressed section 104–21(a) in 
People v. Britz
, 174 Ill. 2d 163 (1996), which, like 
Nitz
, was a post-conviction challenge to a death sentence. Defendant Britz argued, 
inter alia
, that he was on “medication” pursuant to medical orders during his trial proceedings. Britz maintained that, under section 104–21(a), the trial court should have held a fitness hearing. The court began its analysis by citing 
Brandon
, 
Gevas
, 
Kinkead I
, and 
Nitz
 for the proposition that when psychotropic drugs are prescribed to an accused pursuant to medical direction and no fitness hearing is held, either a new trial is necessary or a remand is required in order to establish if the drugs were administered at the time of the proceedings so as to trigger the statute’s application. 
Britz
, 174 Ill. 2d at 195-96. The court determined, however, that Britz did not come within the purview of section 104–21(a) because the medications that he was given were not psychotropic in nature and that the legislature intended to address only psychotropic drugs or their equivalent in the statute. 
Britz
, 174 Ill. 2d at 196-98. The court reached this conclusion because the legislature was concerned with protecting against medications “capable of interfering with [the ability to understand the nature and purpose of the proceedings against him or assist in his defense].” 
Britz
, 174 Ill. 2d at 197. For these reasons, the court concluded that Britz had not been entitled to a fitness hearing on the basis of the medications he had ingested. 
Britz
, 174 Ill. 2d at 198. The court, therefore, affirmed the circuit court’s dismissal of Britz’s post-conviction petition.

Given their previous dissent in 
Nitz
, one would have expected Justices Miller, Bilandic, and Heiple to have concurred only in the judgment of the court, explaining that they did so only because they believed that Britz’s section 104–21(a) claim was not cognizable under the Post-Conviction Hearing Act due its statutory nature. See 
Nitz
, 173 Ill. 2d at 165 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). Moreover, none of these justices registered any disagreement with the premise of the court’s opinion, 
i.e.
, that had the drugs Britz ingested been psychotropic (or the equivalent) then a fitness hearing would have been required pursuant to 
Brandon
 and it progeny. Notwithstanding the views expressed in their previous dissents, each of the three justices joined fully in the court’s decision.

 Section 104–21(a) next came before the court in 
People v. Kidd
, 175 Ill. 2d 1 (1996), a direct capital appeal. Defendant Kidd contended that he was entitled to a fitness hearing under 
Brandon
 because he was taking the drugs Dilantin, Tegretol, and Elavil at the time of the proceedings against him. Despite his consistent dissenting view on the psychotropic drug issue, Justice Miller authored the court’s decision. The court noted that the record on appeal established that Kidd was receiving only Dilantin at the time relevant to the proceedings. 
Kidd
, 175 Ill. 2d at 17. Citing to 
Britz
, the court concluded that Dilantin was not a psychotropic drug or its equivalent; therefore, Kidd “was not entitled to a fitness hearing under section 104–21(a) [and] defense counsel could not have been ineffective for failing to seek one pursuant to that provision.” 
Kidd
, 175 Ill. 2d at 19.

Neither Justice Bilandic nor Justice Heiple filed a separate opinion in 
Kidd
. As in 
Britz
, the three original 
Brandon
 dissenters joined fully in the court’s opinion, without specifically registering their continued disagreement with the court’s interpretation of section 104–21(a). Surprisingly, these three justices joined in an analysis concerning whether the “other medications” referred to in section 104–21(a) were the equivalent of psychotropic drugs–given their previous dissents, these three justices could have taken the position that, even if Kidd had been taking psychotropic drugs as he alleged on appeal, he would not be entitled to a new trial for the reasons previously cited in their dissenting opinions in 
Brandon
, 
Gevas
, 
Kinkead I
, and 
Birdsall
.

Such was the state of this court’s psychotropic drug jurisprudence when Raymond Burgess appealed his conviction and death sentence directly to this court. 
People v. Burgess
, 176 Ill. 2d 289 (1997). I note that today’s decision is remarkable in failing to discuss or even cite the 
Burgess 
decision. Defendant Burgess argued that he was entitled to a fitness hearing under section 104–21(a) because he was taking psychotropic medication at the time of his trial. Following the submission of his initial brief, however, defendant filed a motion in this court requesting a limited hearing pursuant to our decision in 
Kinkead I
. The court granted the motion without recorded dissent, remanding the cause for a hearing for the “ ‘limited purpose of determining whether defendant ingested psychotropic medication at or near the time of his trial and sentencing.’ ”
(footnote: 8) 
Burgess
, 176 Ill. 2d at 299. After the conclusion of the hearing, the parties submitted briefs to this court on the issues raised by the remand proceedings. Defendant contended that he was entitled to a new trial under 
Brandon
 and its progeny because the evidence adduced at the hearing established that he was receiving psychotropic drugs at the time of his trial, but had not received the requisite fitness hearing. In response, the State argued that a new trial was not necessary because the medical evidence adduced at the limited hearing established that defendant was not impaired by the ingestion of the drugs.

Justice Miller, writing for the court, began the analysis of the issue by stating the following:

“The State acknowledges that under our decisions in 
People v. Brandon
, 162 Ill. 2d 450 (1994); 
People v. Gevas
, 166 Ill. 2d 461 (1995), 
People v. Birdsall
, 172 Ill. 2d 464 (1996), and 
People v. Nitz
, 173 Ill. 2d 151 (1996), this court could simply grant the present defendant a new trial, without regard to his actual condition at the time of the proceedings below, given his ingestion of psychotropic drugs during the trial and sentencing hearing. The State argues, however, that we should not invoke the practice of automatic reversal in this case, in light of the evidence revealed at the special supplemental hearing.

We agree with the State that a rule of automatic reversal is not always appropriate. As this case demonstrates, there will be some circumstances in which it can be said that the use of psychotropic medication did not affect the defendant’s mental functioning in such a way that relief would be appropriate. We are aware that we have previously declined to make use of retrospective fitness hearings, noting the difficulty in determining, long after the conclusion of the underlying proceedings, the degree of mental functioning enjoyed then by the defendant.  See 
People v. Birdsall
, 172 Ill. 2d 464, 476 (1996) (citing 
Brandon
 and 
Gevas
). Nonetheless, we believe that, at least in the present case, there are sufficient reasons to depart from our previous practice of automatic reversal and to make a case-specific inquiry into the psychotropic drugs administered to this particular defendant.”
Burgess
, 176 Ill. 2d at 303.

The court went on to conclude that defendant’s own expert witness did not believe that the psychotropic drugs administered to Burgess could have had any effect on Burgess. According to the court, the testimony of defendant’s expert “demonstrates [that] we should not automatically assume that every psychotropic drug will inevitably render the person taking it unfit for purposes of trial or sentencing, and we therefore conclude that retrospective hearings are sometimes proper.” 
Burgess
, 176 Ill. 2d at 304. The court affirmed Burgess’ conviction and sentence.

Justice Harrison dissented, and I joined in his dissent. The dissenting justices questioned why Burgess should be treated differently from the defendants in the other cases which had preceded his. 
Burgess
, 176 Ill. 2d at 325 (Harrison, J., dissenting, joined by Freeman, J.). According to the dissent, the court in Burgess’ case was making the same after-the-fact assessment of fitness that had been repeatedly and consistently rejected in 
Gevas
 and 
Birdsall
. 
Burgess
, 176 Ill. 2d at 325 (Harrison, J., dissenting, joined by Freeman, J.).

The decision in 
Burgess
 is notable because of the position taken in it by the three original 
Brandon
 dissenters, three justices who today comprise 75% of the majority. Recall that none of these three justices believed that due process concerns were implicated by the failure to hold the hearing required under section 104–21(a). Contrary to their previously expressed views, they held, in 
Burgess
, that there could be “some circumstances in which it can be said that the use of psychotropic medication did not affect the defendant’s mental functioning in such a way that relief would be appropriate.” 
Burgess
, 176 Ill. 2d at 303. The converse of such a statement is, of course, that there could be some circumstances in which it 
cannot
 be said that the use of psychotropic medication did not affect a defendant’s mental functioning. 
If, as the three dissenters had maintained prior to 
Burgess
, the failure to hold the hearing required under section 104–21(a) did not implicate due process, why then did Justice Miller construct the 
Burgess
 analysis and why did Justices Bilandic and Heiple concur in it? 
Burgess
 did not 
explicitly overrule 
Brandon
 or any of the cases that had adhered to the rule of automatic reversal enunciated in it. Rather, 
Burgess
 merely modified the type of relief that would be afforded to defendants who had failed to receive the requisite fitness hearing at the time of the proceedings against them. 
Brandon
 and the cases which followed it had held that due process required that a new trial be ordered in all such cases because of the inherent unreliability of retrospective fitness hearings. 
Burgess
 changed the rule in that if it could be later established that the medications did not impair defendant’s ability to participate and assist in his defense, due process did not require that a new trial be ordered. If the original 
Brandon/Nitz
 dissenters were correct in their legal analyses, as the court today insists that they were, then they should not have joined in a decision which still left the basic premise of 
Brandon
 intact–that some inquiry must be undertaken in order to evaluate the effect, if any, the psychotropic drugs had on a defendant’s fitness to be tried and sentenced.
(footnote: 9) Given their views in 
Brandon
, 
Gevas
, 
Birdsall
, 
Kinkead I
, and 
Nitz
, the three dissenters could have chosen to continue to dissent in 
Burgess. 
One would certainly not expect Justice Miller, the author of all of these dissents, to author an opinion which was grounded in principles first recognized in 
Brandon
. The 
Brandon/Nitz
 dissenters cannot have it both ways. After the 
Burgess
 opinion was announced, the court next addressed section 104–21(a) in 
People v. Neal
, 179 Ill. 2d 541 (1997), a capital post-conviction proceeding. Defendant Neal filed a post-conviction petition, his third, in which he alleged that he should have received a fitness hearing pursuant to section 104–21(a) because of his ingestion of psychotropic drugs. The State filed a motion in the circuit court seeking dismissal of the petition, but the circuit court denied the motion. An evidentiary hearing was held at the conclusion of which the circuit court denied post-conviction relief. This court affirmed the denial of relief without dissent. The court held that

“retrospective fitness determinations will normally be inadequate to protect a defendant’s due process rights when more than a year has passed since the original trial and sentencing. In exceptional cases, however, circumstances may be such that the issue of defendant’s fitness or lack of fitness at the time of trial may be fairly and accurately determined long after the fact. In such cases, 
Burgess
 will apply, and a defendant will not automatically be entitled to have his original conviction and sentence automatically set aside for a new trial.” 
Neal
, 179 Ill. 2d at 554.

The court considered Neal’s case to be such an “exceptional” case based on the evidence adduced at the post-conviction evidentiary hearing. See 
Neal
, 179 Ill. 2d at 554 (finding situation at bar “directly analogous to that present in 
Burgess
”). The court further held that although the court in 
Burgess
 was able to assess the evidence “closer in time to the original proceeding,” that fact, in and of itself, was “of no consequence.” 
Neal
, 179 Ill. 2d at 554. The court explained why this was so:

“If the chemical properties of medication are such that their effects could accurately be assessed in light of a defendant’s known medical history, as was the case here, it would not matter whether the evaluation followed the original trial and sentencing by 15 days or 15 years. The result would be the same.” 
Neal
, 179 Ill. 2d at 554.

Therefore, 
Neal
 stands for the proposition that in some, but not all, cases, circumstances may be such that the issue of defendant’s fitness or lack of fitness may be fairly and accurately determined long after the fact. 
Neal
, 179 Ill. 2d at 554. In such cases, a new trial would not be the appropriate remedy for the failure to hold a fitness hearing under section 104–21(a).

The decision in 
Neal
 was issued without any dissent. None of the three original 
Brandon
 dissenters filed separate opinions in the case. This was somewhat surprising because all three previously had noted that post-conviction relief could not be obtained on the basis of the statutory right. See 
Nitz
, 173 Ill. 2d at 165-66 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.). Despite their votes in 
Neal
, Justices Miller, Bilandic, and Heiple appear to have now returned to their pre-
Neal
 view that such a claim is not cognizable in post-conviction cases. 
Moreover, not one member of the court questioned why 
res judicata
 did not bar defendant’s petition since Neal’s petition was his 
third
 such pleading under the Act. The failure of Justices Miller, Bilandic, and Heiple in 
Neal
 to note any of these procedural points seemed to indicate that they had acquiesced in the 
Brandon
 holding as it was modified by 
Burgess
. Moreover, the two dissenting justices in 
Burgess
 also fully joined in 
Neal. 
Thus, it appeared that all seven members of the court had reached a compromise and had settled upon a rule that each could apply. Such an assumption would only be strengthened when the court issued its next opinion in this area, 
People v. Cortes
, 181 Ill. 2d 249 (1998), a direct capital appeal.

Defendant Cortes argued that he was entitled to a new trial because of his ingestion of psychotropic drugs at the time of the proceedings against him. Cortes’ trial had been conducted between October 24 and November 4, 1994, and the sentencing hearing was held from November 9 to November 10, 1994. During the post-trial motions, defense counsel presented the circuit court with a copy of this court’s decision in 
Brandon
 and the appellate court’s decision in 
People v. Guttierez
, 271 Ill. App. 3d 301 (1995), in which the appellate court ordered a new trial for defendant based upon this court’s holding in 
Brandon
. Defense counsel also alerted the circuit court to the fact that several doctors had declared Cortes fit to stand trial under medication. Because it was unclear whether the medication was psychotropic in nature, the trial court ordered a behavioral clinical examination of Cortes and instructed defense counsel to determine the particulars of Cortes’ use of medication. Eventually, the trial court held a fitness hearing on the question of Cortes’ competence. Defense counsel objected, noting that a retrospective fitness hearing was inappropriate and that the only proper remedy was to order a new trial. After receiving evidence at the hearing, the trial court denied Cortes’ motion for a new trial.

In a decision issued without dissent, this court affirmed the trial court’s decision. We began our analysis by noting the development of our case law from the time that 
Brandon
 was decided. We further noted that the General Assembly had amended section 104–21(a) subsequent to 
Brandon
, but that the new amendment could not be applied to Cortes’ case retroactively. 
Cortes
, 181 Ill. 2d at 275 n.2. The court found that 
Burgess
 controlled Cortes’ case because Cortes’ fitness “could be fairly and accurately determined after the fact because, as in 
Burgess
, the evidence showed that the medication ingested by [Cortes] did not have any affect on his fitness.” 
Cortes
, 181 Ill. 2d at 276 (citing 
Burgess
, 176 Ill. 2d at 303-04, and 
Neal
, 179 Ill. 2d at 554).

Thus, 
Burgess
, 
Neal
, and 
Cortes
 unequivocally illustrate that the seven members of this court had reached common ground over the question of how to handle the psychotropic drug issue. The original dissenters had fully joined in decisions that recognized the right to raise the issue, whether it be on direct or collateral review, in cases where a defendant had been deprived of the section 104–21(a) fitness hearing at the time of trial. In addition, the two dissenting justices in 
Burgess
 had joined in the post-
Burgess
 decisions which held that in exceptional cases retrospective fitness determinations could resolve the psychotropic issue.

Our most recent published opinion that addressed section 104–21(a) was 
Kinkead II
, 182 Ill. 2d 316, the appeal from the remand hearing ordered in 
Kinkead I.
 Applying the case-specific approach of 
Burgess
, 
Neal
, and 
Cortes
, the court determined that

“the remand hearing conducted in the case at bar gives rise to a significantly greater concern than existed in 
Burgess
, 
Neal
 or 
Cortes
, that the defendant’s ingestion of antipsychotic drugs during the plea and sentencing proceedings influenced his decision-making abilities. Therefore, our conclusion that the defendants in those cases were not entitled to a new trial does not compel a similar conclusion [here]. Indeed, in this case much of the evidence appears to favor defendant’s argument that the Thorazine he took may have influenced his ability to make a reasoned decision to plead guilty to greater charges and seek a sentence of death.” 
Kinkead II
, 182 Ill. 2d at 347.

 The court therefore concluded that Kinkead should receive a new trial.

The three original 
Brandon
 dissenters disagreed, this time with Justice Heiple writing for them. The dissenting justices took issue with two specific aspects of the court’s decision. The first centered on the retroactive effect of the amended section 104–21(a). Despite the fact that in 
Cortes
 all three justices had joined in an opinion which explicitly rejected the notion that the new amendment was retroactive (see 
Cortes
, 181 Ill. 2d at 275 n.2), the dissent now believed that retroactivity was in order. 
Kinkead II
, 182 Ill. 2d at 351 (Heiple J., dissenting, joined by Miller and Bilandic, JJ.), citing 
First of America Trust Co. v. Armstead
, 171 Ill. 2d 282, 290 (1996) (applying vested rights doctrine). Notwithstanding the alleged retroactivity of the amended section 104–21(a), the three dissenters disagreed with the court’s view of the evidence adduced at the hearing on remand. It is significant to note that the dissenters did not disavow 
Burgess
 or the views expressed in that decision. In fact, their reasoning was based on the recognition in 
Burgess
 that evidence adduced at a later proceeding could establish definitively that the psychotropic drugs did not impair a defendant’s ability to participate and assist in his defense. According to the dissent, the evidence adduced at the hearing “fully comports with the trial court’s conclusion that defendant’s use of Thorazine *** was not medically significant with regard to his fitness to stand trial.” 
Kinkead II
, 182 Ill. 2d at 358 (Heiple, J., dissenting, joined by Miller and Bilandic, JJ.). For these reasons, the dissenting justices did not believe that Kinkead was entitled to a new trial.

The foregoing review of this court’s psychotropic drug case law affirmatively belies today’s assertion that our case law in this area has developed in an unprincipled and unintelligible fashion. See slip op. at 18. To the contrary, my review demonstrates that the three original 
Brandon/Nitz
 dissenters joined in decisions which recognized the right to make an inquiry, be it an after-the-fact inquiry. Nevertheless, these three justices now believe that applying our current case law to this defendant is unnecessary because that case law is “erroneous.” As I stated at the outset of this dissent, neither of the parties have asked this court to revisit the arguments made in 
Brandon
 and 
Nitz
. The only reason those arguments have been resurrected in this case is because the three dissenters now have a fourth vote to achieve that which they could not achieve on the day 
Gevas
, 
Kinkead I
 and 
II
, 
Birdsall
, 
Nitz
, 
Burgess
, 
Neal
, and 
Cortes
 were issued–to overrule 
Brandon
. Today’s decision merely reiterates, this time with the approval of four justices as opposed to three, the same arguments made by Justice Miller in his initial dissents. While my colleagues are quick to point out the alleged deficiencies in the legal analyses contained in 
Brandon
, 
Gevas, Kinkead I
 and 
II
, and 
Nitz
, they are utterly silent as to the fact that these decisions were modified by 
Burgess
 and that for the past two years, this court, up until today, had been content to follow the approach that Justice Miller himself had constructed in 
Burgess
.
(footnote: 10) What the three dissenters have failed to explain today is why defendant Mitchell in this case cannot have the opportunity to establish that the antipsychotic drugs he ingested may have affected him in a way that did not affect defendant Burgess. If, as Justice Miller clearly stated in 
Burgess
, there might be some circumstances that would not necessitate a new trial, then why does he refuse to apply his own analysis to the case at bar? Since the time that 
Brandon
 was issued, Justices Miller, Bilandic, and Heiple have concurred in subsequent decisions which hold that some sort of after-the-fact inquiry is necessary in cases such as this. Thus, I believe that the opportunity to overrule 
Brandon
 and its progeny has long passed. In several of our earlier decisions on this issue, the State specifically asked the court to repudiate the 
Brandon
 rule, and we explicitly declined to do so. In the interim, we have issued opinions approving of a defendant’s right to inquire if the psychotropic drugs affected fitness. Although the court has changed its view as to how that inquiry is to be made, the court has consistently recognized a defendant’s ability to raise the issue and the court has consistently, in every case since 
Brandon
 was decided, resolved the issue on its merits. Our previous opinions represented this court’s best effort to deal with the critical questions raised by the failure to have held the hearing required by section 104–21(a). I must remind my colleagues those opinions represent the law and as such are relied upon by the judiciary, prosecutors, criminal defendants, as well as the citizens of this state.
(footnote: 11) For the three original 
Brandon
 dissenters to shift gears now, after having participated in and authored opinions in other cases in which psychotropic drugs were in issue, is, with all due respect, inconsistent and without principle. 

As I noted earlier, the court contends that 
stare decisis
 need not be applied in this case because “[n]o reasonable observer of this court’s jurisprudence could argue that the law in this area has been developing in a principled and intelligible fashion.” Slip op. at 18. The court points out that, although in 1995 this court rejected any notion of retrospective fitness hearings as being reliable, two years later in 1997, “we saw no problem with a retrospective fitness hearing conducted 15 years after defendant’s trial and sentencing.” Slip op. at 18, citing 
Neal
, 179 Ill. 2d at 553-56. The court then states that “[i]n 1998, we held that the automatic reversal rule of 
Brandon
 had been replaced by the ‘case-by-case’ approach and that a defendant could no longer prevail on a request for a new trial simply by showing that he had been taking psychotropic medications at the relevant time.” Slip op. at 18, citing 
Kinkead II
, 182 Ill. 2d at 340. I have already demonstrated how the court today has manipulated our jurisprudence in this area by conveniently omitting the role 
Burgess
 played in this history and the hand that the original 
Brandon/Nitz
 dissenters had in creating 
Burgess
. While Justice Rathje, who was not a member of this court at the times those cases were decided, is entitled to the view that such a development is unprincipled and unintelligible, I find it beyond belief that Justices Miller, Bilandic, and Heiple could share in that view. After all, it was Justice Miller, writing for the court in 
Burgess
, who opened the door for the retrospective fitness hearings. See 
Burgess
, 176 Ill. 2d at 303. Had Justices Miller, Bilandic, and Heiple been concerned with the propriety of such a 
volte face
, they should not have been willing to adopt 
Burgess
 and should not have added their imprimatur to the decisions in 
Neal
 and 
Cortes
–two cases which followed the approach endorsed by them in 
Burgess
. Moreover, to cite 
Kinkead II
 as an example of unprincipled jurisprudence is to mischaracterize the decision–the court in 
Kinkead II
 merely followed the precedent of the court as established in 
Burgess
 and applied in 
Neal
 and 
Cortes
. Under the case law set forth in those decisions, the court concluded that defendant Kinkead was entitled to a new trial.

In addition, the court’s decision in 
Burgess
 to change from a bright line rule announced in 
Brandon
 to a case-specific approach, though criticized at the time by two members of the court, is hardly the type of change in circumstance that warrants the overturn of 
stare decisis
. As noted in 
Kinkead II
, the case-by-case approach comports with due process and ensures that those defendants who were ingesting psychotropic drugs were not impaired by them to the extent that their ability to participate in the defense was hampered. Under today’s decision, such similarly situated defendants now have no recourse whatsoever. I do not believe that the doctrine of 
stare decisis
 should be overturned when to do so produces such an unjust result. I must point out that, when this issue arises in the context of a capital case, as all of our cases have been, the need to ensure, as the statute then required, that antipsychotic drugs did not impair or hamper the defendant’s ability to assist in his or her defense becomes all the more important. This last point should not be overlooked for it leads to another disturbing aspect of today’s decision. All of our psychotropic drug cases have been capital appeals, either direct appeals from trial or appeals from post-conviction proceedings. Although this court is a court of permissive review, capital appeals come to us directly. See Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a), 651(a). As a result, this court is frequently presented with the same arguments in case after case, in term after term. Once a legal question has been settled and closed to further argument, I, for one, cannot emphasize enough the need for its consistent application in similar cases. The law of this court cannot be seen by the bar and the public to be one that is constantly “in flux,” changing from opinion to opinion, particularly in capital cases. Both the State and the appellate defense bar should be entitled to view a decision of this court on a given issue as static once that issue has been settled. Both this case and the Palmer case (see 
supra
 at 64 n.11) all too sadly demonstrate that it is the arbitrary hand of fate, as opposed to the established rule of law, that will mean the difference between life and death. In my view, the court today fails to recognize the important need for following 
stare decisis
 in capital cases. 

B

In light of the above, I believe that the circuit court in this case erred by dismissing defendant’s psychotropic drug claim without an evidentiary hearing. Defendant’s petition alleged that he was taking two psychotropic medications at the time of his trial. Had defense counsel requested a fitness hearing at that time, the circuit court would have been required by statute to hold the hearing. Therefore, I would instruct the circuit court to conduct an evidentiary hearing in order to establish what effect, if any, those drugs had on defendant’s fitness during the proceedings. As this court acknowledged in 
Neal
, in certain cases, “circumstances may be such that the issue of defendant’s fitness or lack of fitness at the time *** may be fairly and accurately determined long after the fact. In such cases, 
Burgess
 will apply.” 
Neal
, 179 Ill. 2d at 554. I, therefore, would instruct the court to follow the precedents of this court as set forth in 
Burgess
, 
Neal
, 
Cortes
, and 
Kinkead II
.

II

Today’s result sends the unfortunate message to the bench, the bar, and the public that “this court does not decide issues based on the law, but based instead on who happens to be sitting on the court at a particular time.” 
People v. Lewis
, 88 Ill. 2d 129, 170 (1981) (Clark, J., concurring). In this respect, Justice Clark’s sentiments, expressed almost two decades ago, have resonance today:

“It is my considered opinion that, having once expressed my disagreement with an opinion of the court and then having followed such opinion in a case which was decided shortly after, it would be inconsistent to reverse my position simply because a new justice has joined this court. I agree *** that the doctrine of 
stare decisis
 does not mean that the law is immutable and rigid. On the contrary, I am a firm believer in the continuing evolution of our law and of the requirement that it change to meet changing circumstances. I think, however, that the circumstances which warrant changes in the law do not include changes in personnel. Rather, the circumstances I consider significant enough to bring about changes in the law are those which render an existing rule of law impracticable or unjust and which will bring about a sensible and just result. When those changes are present, I will vigorously vote to change the law.

* * *

*** [O]nce a judge has expressed a differing view from the majority, and has then acquiesced in the majority view, to the point of writing an opinion which accords the majority’s view its rightful place as the controlling law on the matter, due regard for the consistency of the court’s opinions leads a judge to continue to follow the majority’s view.” 
People v. Lewis
, 88 Ill. 2d 129, 169-71 (1981) (Clark, J., concurring).

Moreover, Justice Clark’s view of 
stare decisis
 is not at all novel. This court, in a 
per curiam
 opinion, observed just five years ago that:

“The doctrine of 
stare decisis
 is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. 
Stare decisis
 permits society to presume that fundamental principles are established in the law rather than in the proclivities of individuals.” C
hicago Bar Ass’n v. Illinois State Board of Elections
, 161 Ill. 2d 502, 510 (1994).

See also 
People v. Fuller
, 187 Ill. 2d 1, 23 (1999) (Bilandic, J., dissenting) (noting that 
stare decisis
 “should not be disregarded simply because some members of the court disagree or have changed their minds”). By joining in 
Burgess
, 
Neal
, and 
Cortes
, Justices Miller, Bilandic, and Heiple ceased to voice their spirited dissents on this issue and to challenge the legal analyses contained in 
Brandon
 and its progeny. The three dissenters, in those cases, did not question, as they do today, the legal underpinnings of the earlier decisions. To the contrary, they merely changed the remedy for the alleged violation–from automatic reversal to an after-the-fact, case-specific inquiry. Therefore, I respectfully disagree that the doctrine of 
stare decisis
 must be overridden today on the basis that our case law in this area was incorrect. Although the three original 
Brandon
 dissenters consistently voted against the automatic reversal rule created in 
Brandon
, they were instrumental in creating the retrospective approach they now criticize as “confused and erratic.” Had they indeed felt that way, they should never have voted to adopt 
Burgess
 in the first place.

As I have endeavored to show by my review of our precedent, not one circumstance has changed in our psychotropic drug jurisprudence since this court announced its decision in 
Burgess.
 All of the legal arguments set forth in today’s opinion are the same arguments that were made and considered at the time 
Brandon
 and 
Nitz
 were decided. These same arguments were in existence when the court issued 
Burgess
. The only “circumstance” that has changed since this court announced 
Burgess
 is that Justice John Nichols, who joined in 
Brandon
, authored 
Gevas
, joined in 
Kinkead I
 and 
II
, and joined in 
Birdsall
, 
Nitz
, 
Britz
, 
Kidd
, 
Burgess
, 
Neal
, and 
Cortes
, has retired, and Justice Rathje has been appointed to fill the vacancy created by the retirement. I submit that this type of “circumstance” does not rise to the level necessary to overturn the doctrine of 
stare decisis
. 

Unfortunately, today’s decision demonstrates that “[p]ower, not reason, is the new currency of this [c]ourt’s decisionmaking.” 
Payne v. Tennessee
, 501 U.S. 808, 844, 115 L. Ed. 2d 720, 748, 111 S. Ct. 2597, 2619 (1991) (Marshall, J., dissenting, joined by Blackmun, J.). As noted throughout this dissent, neither the law nor the facts supporting the 
Brandon/Burgess
 rule underwent any change since the time that this court issued its last psychotropic drug case, 
Kinkead II
, in 1998. Only the personnel of this court did. One must now wonder how many other of our previous decisions, decided by 4-3 margins, will be similarly overruled on the basis of a change in court personnel. I must stress again that neither party in this case asked this court to revisit 
Brandon
 and its progeny. The court acts today 
sua sponte
. If this court can so cavalierly disregard its own precedent, we surely cannot expect others to follow it nor can we justly criticize those who do not. Today’s imprudent action invites nothing but open defiance of our precedent and seriously undermines this court’s legitimacy. Clearly, there is no genuine reason not to apply 
Burgess
 to the present case, and the court’s attempt to style its decision as one made to restore “some stability and reason to this area” (slip op. at 19) is beyond credulity. It is obvious to me, at least, that four members of this court are willing to discard any principle of constitutional law that, in the past, was recognized over the votes of three dissenting justices and with which four justices currently disagree. This does not bode well for the future. At the end of this current year, the makeup of this court will undergo some change because four justices by virtue of election or retention may not return. While I am not clairvoyant, I do know that when the court reconvenes in January 2001, the current makeup of the court will have changed. It is my sincere hope that this case will not serve as a model for future courts to follow.

CHIEF JUSTICE HARRISON and JUSTICE McMORROW join in this dissent.

FOOTNOTES
1:
1
Brandon
 held that if a defendant is taking psychotropic medication at the time of trial or sentencing, and his attorney does not request a section 104–21(a) fitness hearing, the defendant has received the ineffective assistance of counsel and is entitled to a new trial. 
Brandon
, 162 Ill. 2d at 458-61.

2:
2
The PDR has a listing for “Psychotropics,” but the only listing under that heading says “see under Psychotherapeutic Agents.” Physicians’ Desk Reference 215 (53d ed. 1999).

3:
3
Defendant does not argue that the Illinois Constitution affords him greater protection in this regard.

4:
4
The State argues primarily that the evidence shows that it was just as likely that Viroon Williams told the police where the murder weapon was hidden. This assertion, however, does not defeat defendant’s argument. The police also learned about Williams from defendant.

5:
5
The court in 
Burson
 did not evaluate the procedural default in terms of our plain error rule. Nevertheless, the court’s recognition that error was of constitutional magnitude comports with the second prong of the plain error rule, 
i.e.
, that the error affected a substantial right. See 134 Ill. 2d R. 615(a); 
People v. Vargas
, 174 Ill. 2d 355, 363 (1996).

6:
6
Justices Miller, Bilandic, and Heiple apparently now believe differently and challenge the definition of the word “entitle.” See slip op. at 12. 

7:
7
The court noted that the General Assembly had, during the pendency of Birdsall’s appeal, amended section 104–21(a). The amendment provided that, effective December 13, 1995, the granting of a fitness hearing based on the defendant’s treatment with psychotropic drugs is not required unless the court finds there is a 
bona fide
 doubt of the defendant’s fitness. The court held that the amendment did not apply to Birdsall’s case and expressed no opinion regarding the amendment’s effect on future cases after the effective date of the amendment. 
Birdsall
, 172 Ill. 2d at 475 n.1.

8:
8
The fact that Justices Miller, Bilandic, and Heiple concurred in the order was surprising given the fact that in 
Kinkead I
 they specifically took issue with the need to remand the case for a limited hearing. According to their dissent in 
Kinkead I
, the lack of the evidentiary basis for the claim in the record on appeal established that Kinkead did not seek in “a timely manner” the hearing to which he was entitled. See 
Kinkead I
, 168 Ill. 2d at 419 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

9:
9
I, along with Chief Justice Harrison and Justice McMorrow, am not alone in my interpretation of the 
Burgess
 decision. Various panels of the appellate court have taken the view that “while 
Burgess
 represents a departure from the rule of automatic reversal, it is still entirely consistent with the fundamental underpinning of 
Brandon
–to protect the due process rights of a defendant who ingested psychotropic medication.” 
People v. Flynn
, 291 Ill. App. 3d 512, 520 (1997) (reversing conviction and remanding for a new trial pursuant to 
Burgess
). See also 
People v. Jamerson
, 292 Ill. App. 3d 944, 951 (1997) (remanding matter for a limited hearing pursuant to 
Burgess
); 
People v. Abraham
, 293 Ill. App. 3d 801, 804-05 (1997) (same). 

10:
10
Following the issuance of 
Burgess
, this court remanded to the appellate court those cases which had been decided under the automatic reversal rule enunciated in 
Brandon
. See, 
e.g.
, 
People v. Johns
, 173 Ill. 2d 535 (1997) (directing appellate court to reconsider its holding in light of 
Burgess
).

11:
11
An example of such reliance can be found in the case of another death row inmate, Leslie Palmer. On June 1, 1998, Palmer filed a post-conviction petition in which he alleged, 
inter alia
, that he was denied a section 104–21(a) fitness hearing at the time of his capital sentencing hearing. The State confessed error on the psychotropic drug claim, agreeing that a new sentencing hearing was required. The parties eventually reached an agreement in which defendant would forgo all future appeals in exchange for a 65-year prison sentence. The circuit court approved the agreement, and this court closed defendant’s supreme court file on September 17, 1999. Clearly, the State confessed error in reliance on our previous psychotropic drug decisions. Had the State’s Attorney of Mason County, who prosecuted Palmer, chosen not to confess error on the psychotropic drug issue, Palmer would still be on death row today.